In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-3966

HAROLD E. SONNLEITNER,

*Plaintiff-Appellant,*

*v.*

STANLEY YORK, JOANN O'CONNOR,
KATHLEEN BELLAIRE, KATHY
KARKULA and JOE LEANN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1046—**Rudolph T. Randa**, *Chief Judge.*

ARGUED APRIL 11, 2002—DECIDED SEPTEMBER 12, 2002

Before CUDAHY, DIANE P. WOOD, and EVANS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Harold Sonnleitner is a nurse at the Winnebago Mental Health Institute, a state-run psychiatric facility. In 1995, Sonnleitner was charged with a series of work rule infractions. A predisciplinary hearing was held, and shortly thereafter he was demoted to a non-supervisory position. On appeal, the Wisconsin Personnel Commission determined that there was only evidence to support one work rule violation and that a five-day suspension was the appropriate discipline. After the Institute implemented the suspension but failed

to reinstate him to a supervisory position, Sonnleitner commenced an action in Wisconsin state court to enforce the Commission's ruling. He also filed a claim for damages, pursuant to 42 U.S.C. § 1983, against the Institute and various state officials, alleging the violation of his procedural due process rights under the Fourteenth Amendment. The defendants then removed this matter to federal court.

During summary judgment proceedings, Sonnleitner conceded that his state law claim was barred on procedural grounds due to his failure to comply with a service of process requirement of Wisconsin law. The district court subsequently ruled that the individual defendants were entitled to qualified immunity and that Sonnleitner could not state a valid claim under § 1983 because he no longer had a right to be reinstated under state law. Sonnleitner now appeals only adverse judgments on the federal law claims. For the following reasons, we AFFIRM.

I.

The Winnebago Mental Health Institute is located in Winnebago, Wisconsin, and is operated by the Wisconsin Department of Health and Family Services (WDHFS). Sonnleiter has been employed by the Institute since 1980. In 1988, he was promoted to the position of "Nursing Supervisor 1/Nurse Manager" in charge of the Forensic Behavior Treatment Center. On October 25, 1994, Sonnleitner was given a three-day suspension for making inappropriate sexual remarks about a patient in the presence of a female co-worker, who found them offensive, unwelcome and harassing. Sonnleitner appealed this action to the Wisconsin Personnel Commission.

On December 4, 1995, when the appeal of the first disciplinary action was still pending, three incidents occurred which form the basis for Sonnleitner's eventual

demotion. First, Sonnleitner placed gum balls in the dayroom of the unit. Although there was no formal policy on gum balls, this action was considered problematic because it could interfere with patient discipline and medication. Second, Sonnleitner permitted a "Level 1" patient to attend a special luncheon for occupational therapy patients. Third, Sonnleitner escorted three patients to a laboratory for DNA testing under a newly enacted state sexual predator law. Patients had a right to refuse to take the test, and two of the patients tended to be very resistant to the test. Sonnleitner briefly explained the test to the three patients and promised them a "treat" if they agreed to cooperate. Before returning to the unit, Sonnleitner took the three patients to the "Big Canteen" and bought them ice cream. Indulging the patients in this way allegedly interfered with the Institute's behavior treatment program, which allowed privileges commensurate with a patient's acceptable behavior.

On the following day, these incidents were reported to Kathleen Bellaire, Director of Nursing. Bellaire subsequently began a formal inquiry, which included a written statement of events from the Program Director who reported the incidents, a fact-finding meeting and the logging of detailed complaint notes. On December 13, 1995, Sonnleitner received three memoranda from Bellaire (each corresponding to one of the three incidents we have described) notifying him he was being charged with violations of Work Rule #1 and that a predisciplinary meeting would be held in her office on December 18.

According to a formal, contemporaneous summary prepared by Bellaire, four people attended the December 18 predisciplinary meeting: Sonnleitner, Bellaire, Kathy Karkula (Director of Human Resources) and Dan Leeman (Management Support). Sonnleitner was given the opportunity to address each of the three specific charges. However, Bellaire ultimately found his reasons for his actions

unpersuasive. After discussing Sonnleitner's statements, the summary concludes:

> Clearly work rule one was violated when Sonnleitner bought three patients a treat at the canteen with his own money. It also appears that his decision making in these situations is in violation of the program and set up an untherapeutic atmosphere on the unit where he is the "Good Guy" and his fellow staff are the "Enforcers."

The summary also stated that "[i]t appears that he has been unable to resolve his negative feelings about the program director and is purposely thwarting her authority to the detriment of the patients and his own staff." Following the meeting, Sonnleitner was immediately suspended with pay.

During the next several days, Bellaire conducted additional fact-finding meetings and interviewed various other staff members. On December 19 and 20, Bellaire logged notes of her interviews with three Institute employees, which generally corroborated her earlier findings and were, according to her summary notes, partially at odds with the statements made by Sonnleitner two days earlier. Another fact-finding meeting was held on December 28, which was attended by Bellaire, Karkula and Mary Howard, the Program Director who initially reported the three incidents. In a formal, contemporaneous summary of this meeting, Bellaire recounted Howard's version of the three incidents at issue as examples of the corrosive effect Sonnleitner was having on her unit. In addition to the three specific incidents, Howard complained that Sonnleitner's involvement with activities in the unit was minimal, that he rarely attended treatment conferences and, when he did, his participation was minimal, and that he appeared to spend an inordinate amount of time in the day-room watching television.

Upon completing her investigation, Bellaire prepared a disciplinary recommendation report (Bellaire report) that enumerated four specific work rule violations. The first three offenses involved the three patient incidents we have discussed. The report concluded that these three incidents violated Rule #1, which prohibits all employees from engaging in the following acts: "Disobedience, insubordination, inattentiveness, negligence, or refusal to carry out written or verbal assignments, directions, or instructions." The fourth offense was based on allegedly inaccurate and incomplete information that Sonnleitner had provided during his predisciplinary hearing. The report concluded that this conduct violated Rule #7, which requires an employee to provide "accurate and complete information" whenever required to do so by management.

However, below the specification of the four violations, the Bellaire report included a paragraph that referenced three potentially more serious examples of misconduct, which seemed to echo the allegations made by Mary Howard during the December 28, 1995, fact-finding meeting. According to this paragraph, Sonnleitner had: (a) "neglect[ed] his duties as nursing supervisor to the point where staff found it necessary to go to the program director for information and decisions which they had previously gone to their nurse manager for"; (b) "failed to participate in treatment activities on the unit such as patient review and treatment conferences"; and (c) "spent much of his time daily in the day room area watching TV." The report went on to read, "Many of these performance issues were addressed in a focussed [sic] PPDR during 1995. The focussed [sic] PPDR also included working cooperatively with the program director in unit decision

making[,] which he clearly has not done."[1] The report then concluded with a recommendation that Sonnleitner be involuntarily demoted to a staff nurse position.

On January 2, 1996, this report was forwarded to Stanley York, Director of the Institute, who concurred in the decision to demote Sonnleitner. The following day, Sonnleitner was informed in person of this action. He was also given a letter from York, which stated that he was being demoted for "failure to meet supervisor and administrative duties *and* violations of DH&SS Work Rules #1 and #7." (emphasis added).[2] The thrust of Sonn-

---

[1] The PPDR document is the WDHFS's "Performance Planning and Development Report," which is part of a standard annual or semi-annual evaluation process mandated by Wis. Stat. § 230.37. After the 1994 incident involving Sonnleitner's inappropriate sexual remark, Bellaire recommended a "concentrated PPDR" as part of the Institute's response. This document, which presumably is the same as the "focussed PPDR" mentioned in the Bellaire report, found that Sonnleitner was meeting all of his job requirements. However, it included the criticism that Sonnleitner "could offer more comments" during treatment conferences, patient review, shift reports and staff meetings.

[2] During the course of the litigation below, the reasons for Sonnleitner's demotion have not been consistently described. For example, in the interim decision issued by the Wisconsin Personnel Commission, the finding of facts directly quote the text from the demotion letter stating that Sonnleitner was being demoted for (1) the failure to meet supervisor and administrative requirements, which presumably corresponds to the unenumerated paragraph in the Bellaire report, and (2) the violations of Work Rules #1 and #7. *See Sonnleitner v. Department of Health & Family Serv.*, Nos. 94-1055-PC, 96-0010-PC, slip op. at 4, ¶11 (Wis. Personnel Comm. Feb. 8, 2000). However, in its legal analysis, the Commission states, "[The WDHFS] demoted [Sonnleitner] to Nurse Clinician 2 for violating work rules 1 and 7 . . . ." *Id.* at 13.

(continued...)

leitner's procedural due process claim is that he was only accorded a predisciplinary hearing for the three Rule #1 violations, but not for the Rule #7 offense or for the unenumerated charges. Notwithstanding his objections, Sonnleitner agreed to accept a new position as a unit staff nurse in order to protect his employment with the state.

Sonnleitner appealed his demotion to the Wisconsin Personnel Commission, which consolidated the matter with the earlier appeal. On February 18, 2000, the Commission issued an interim decision, which affirmed the three-day suspension for the 1994 incident. However, the Commission also concluded that Sonnleitner had committed only one Rule #1 violation (the ice cream incident) and that there was insufficient evidence that Sonnleitner had violated Rule #7. Therefore, under a policy of progressive discipline, the Commission held that a five-day suspension was an appropriate punishment and that the demotion to a non-supervisory position was excessive discipline. Although the Commission's findings of fact section directly quoted the three unenumerated offenses from the Bellaire report, the Commission's legal analysis indicated that Sonnleitner's demotion was predicated only on the three Rule #1 violations and the one Rule #7 violation. *See* note 2, *supra.* Therefore, in practical effect, the Personnel Commission seemed to adopt the WDHFS's

---

[2]  (...continued)

In contrast, the district court stated that "[t]he alleged Rule 7 violations were: (1) providing inaccurate and incomplete information during his predisciplinary meeting, (2) neglecting duties as nursing supervisor, (3) failing to participate in treatment activities on the unit . . . and (4) spending much of his time in the day room area watching television." *See Sonnleitner v. York*, No. 00-C-1046, slip op. at 2 n.2 (E.D. Wis. Oct. 17, 2001). The district court's categorization of the rule violations is plainly incorrect.

position that Sonnleitner had been charged with only four work rule violations (rather than seven).[3]

The Personnel Commission's opinion and order became final on April 19, 2000. Sonnleitner was informed of this decision, and he was sent a Notice of Appeal Rights. Upon remand, the Institute implemented the five-day suspension but did not reinstate Sonnleitner to his former supervisory position. Institute officials rejected Sonnleitner's request to become a Unit Director, reasoning that his pre-demotion position of Nurse Manager no longer existed and that it had no obligation to place him in another position. In response to an inquiry made by Sonnleitner's lawyer, an attorney from the WDHFS sent a letter on May 3, 2000, stating that the State would be in full compliance with the Commission order by permitting Sonnleitner to remain in his current position at the Institute, where he was actually paid more money than in his former job. The claim of increased pay was correct; Sonnleitner shielded himself from the adverse economic effect of his demotion by requesting a transfer to the night shift, where he earned a pay premium.

---

[3] We cannot conclude that the Wisconsin Personnel Commission failed to analyze the issues squarely before it. Based on our examination of the record, it is clear that the WDHFS attempted first to justify the demotion by reference to the three Rule #1 violations, essentially abandoning the Rule #7 violation as a basis for action. Thus, the WDHFS took the position that Sonnleitner had been charged only with a total of four violations. Although Sonnleitner's brief in the proceeding before the Personnel Commission complained that Bellaire included the unenumerated charges in her recommendation report for the purpose of obtaining York's assent to a demotion, this argument has obvious strategic limitations; insofar as the purpose of this proceeding was to reverse an improper demotion, Sonnleitner was undoubtedly better off challenging the *fact* rather than the *method* of his demotion.

On June 19, 2000, Sonnleitner commenced an action in Wisconsin state court to enforce the Commission's ruling. He also filed a § 1983 claim for damages against the WDHFS and four Institute supervisors (individually and in their official capacities), alleging that he was deprived of his right to a supervisory position without due process of law. Defendants subsequently removed this action to federal court and there filed a motion to dismiss and for summary judgment.

During the district court proceedings, it soon became apparent that Sonnleitner's state law claim had been extinguished by a procedural error. Under Wisconsin law, if Sonnleitner wished to appeal the Institute's interpretation of the Commission's order, he had to file *and serve* his complaint within 60 days of the failure to comply with the order. *See* Wis. Stat. § 230.44(4)(c). Although he filed on time, he served the complaint on the Chairman of the Personnel Commission instead of on the proper party, Joe Leann, the Secretary of the WDHFS. By the time he corrected the error on July 10, 2000, the time for service of process under Wisconsin law had expired. In his reply brief in the district court, Sonnleitner agreed with the defendants that Sonnleitner's state law claim was barred on procedural grounds. However, he simultaneously argued that "Section 1983 provides [the plaintiff] with all the remedies he is seeking."

The district court construed Sonnleitner's statements in his reply brief as an abandonment of any cause of action based on state law and, therefore, dismissed the state law claim. The district court also granted summary judgment for defendants on the § 1983 claims, ruling that they were entitled to qualified immunity in their individual capacity because it was objectively reasonable for the defendants not to hold predisciplinary hearings with respect to all the alleged rule infractions. The district court also granted the WDHFS's motion to dismiss, ruling

that, since Sonnleitner has no right to be reinstated under state law, he could not state a federal cause of action under § 1983. Sonnleitner now appeals only the federal law claims based on the deprivation of procedural due process.

## II.

A grant of summary judgment is reviewed de novo. *Strasburger v. Bd. of Educ., Hardin County Cmty Unit Sch. Dist. No. 1*, 143 F.3d 351 (7th Cir. 1998). Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A grant of a motion to dismiss is also reviewed de novo. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

This case presents one central issue for review, which we must first address before turning to two related subsidiary issues. The major issue is whether Sonnleitner was deprived of his procedural due process rights when the Institute demoted him without a predisciplinary hearing as to *all* of the alleged misconduct referred to in the demotion letter. In the posture of summary judgment, in which we are required to view all facts, and make all reasonable inferences, in Sonnleitner's favor, we believe that Sonnleitner has adequately alleged a procedural due process violation. Therefore, we must also consider (a) whether the individual defendants are entitled to qualified immunity and (b) whether Sonnleitner's demotion represents an ongoing violation of state law, such that his official capacity claim falls within the *Ex Parte Young* exception to Eleventh Amendment state immunity. Each of these issues will be addressed in order.

A.

In analyzing a procedural due process claim, this court follows a two-step process: "The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Townsend v. Vallas*, 256 F.3d 661, 673 (7th Cir. 2001) (quoting *Strasburger*, 143 F.3d at 358). Here, it is undisputed that Sonnleitner possessed a property interest in his supervisory position by virtue of his employment with the state. *See* Wis. Stat. § 230.34 ("An employee with permanent status in class . . . may be removed, suspended without pay, discharged, reduced in base pay or demoted only for just cause."). Moving to the second step to determine the amount of process due, we note that Sonnleitner's complaint does not attack the adequacy of the full process available to him under Wisconsin law. Indeed, Sonnleitner was accorded a full evidentiary hearing before the Wisconsin Personnel Commission. Rather, Sonnleitner contends that he was entitled to a predisciplinary hearing as to *all* the charges contained in the Bellaire report. As such, he argues that the December 18, 1995, predisciplinary meeting fell short of minimum due process requirements because it focused only on the three Rule #1 violations.

To support this claim, Sonnleitner directs us to *Cleveland Board of Education v. Loudermill*, 470 U.S. 523 (1985). In *Loudermill*, the Court held that the procedural due process rights of two school district employees were violated when they were fired by their employer without the benefit of a pre-termination hearing. *Id.* at 547-48. However, contrary to Sonnleitner's argument, *Loudermill* does not mandate any hard and fast rules on the specifics of predisciplinary due process. Rather, the Court adopted an approach that was both flexible and fact-specific:

> [T]he pre-termination hearing, though necessary, need not be elaborate. We have pointed out that the formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

*Id.* at 545 (quotations and citations omitted).

Despite his arguments to the contrary, *Loudermill* does not support Sonnleitner's procedural due process claim. At the most fundamental level, *Loudermill* is factually distinguishable, since the public employees in that case were *discharged* without *any* pre-termination proceedings. Although we do not intend to disparage the personal, professional and financial hardship of Sonnleitner's demotion,[4] this adverse employment action is in all respects less onerous than the termination of the two workers in *Loudermill*, who were unemployed—and thus unpaid—for a year or more as they exhausted their administrative remedies. *Id.* at 536-37. Also, Sonnleitner was afforded some measure of pre-deprivation process. The question that remains is whether the alleged imperfections or shortcomings in this process ultimately give rise to a constitutional claim.

Several years after *Loudermill*, the Court revisited the issue of predisciplinary due process in a context closer to the present case. In *Gilbert v. Homar*, 520 U.S. 924 (1997),

---

[4] The Commission determined that the Institute had "just cause" for *disciplining* Sonnleitner but that the demotion was excessive punishment. Since the Commission's decision is not subject to review by this court, and because it was a product of a full evidentiary hearing, we accept its conclusions as true.

a police officer employed by a public university was arrested in a drug raid conducted by state police and charged with a felony. Effective immediately, he was suspended without pay. *Id.* at 927. Although all criminal charges were dismissed five days later, the suspension remained in effect while the university police department conducted its own investigation. *Id.*

Approximately three weeks later, the officer met with his police chief to convey his side of the story. The officer was then informed that the state police had provided his employer with information that was "very serious in nature." *Id.* What he was not told, however, was that this information included a report of his alleged confession on the day of his arrest. *Id.* As the Court noted, "he was consequently unable to respond to damaging statements attributed to him in the police report." *Id.* A week later, after the officer had read the state police report, he was informed that he would be demoted to the position of groundskeeper and given backpay at the lower rate of pay assigned to the lower position. The following day, the officer was given the opportunity before the university president to respond fully to the charges. The president, in turn, sustained the charges.

The Court ultimately ruled that failure by the university to provide the officer with a pre-deprivation (i.e., pre-suspension) hearing did not violate procedural due process. *Id.* at 933. In reaching this conclusion, the Court noted the well-established axiom that "'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* at 930 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The Court then "balanced three distinct factors: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of addi-

tional or substitute procedural safeguards; and finally, the Government's interest.'" *Id.* at 932 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see also Alexander v. Wis. Dept. of Health & Family Serv.*, 263 F.3d 673, 688 (7th Cir. 2001) (citing and applying three-part balancing test); *Porter v. DiBlasio*, 93 F.3d 301, 306-07 (7th Cir. 1996) (same); *Colon v. Schneider*, 899 F.2d 660, 670 (7th Cir. 1990) (same). This three-part framework is often referred to as the *Mathews* balancing test. *See*, *e.g.*, *Dusenbery v. United States*, 122 S.Ct. 694, 699 (2002); *Porter*, 93 F.3d at 306; *DeVito v. Chicago Park Dist.*, 972 F.2d 851, 855 (7th Cir. 1992).

Under the first part of the *Mathews* balancing test, which weighed the private interests of the officer, the Court distinguished *Loudermill* by noting that "the [temporary] lost income is relatively insubstantial (compared with termination)," and that other fringe benefits such as health and life insurance were not placed in jeopardy. 520 U.S. at 932. The Court then reasoned that the officer's private interests were outweighed by the university's interest in removing from a position of high visibility and trust a campus police officer who had been charged with a felony. *Id.* Finally, in considering the risk of error and the appropriateness of additional or alternative safeguards, the Court noted that the purpose of any presuspension hearing would have been "to assure that there are reasonable grounds to support the suspension without pay." *Id.* at 933. However, this additional step was found to be unnecessary because reasonable grounds "had already been assured by the arrest and the filing of the charges" and that these charges emanated from "an independent third party." *Id.* at 933-34.

However, in *Gilbert*, the analysis of the officer's presuspension procedural due process rights did not end the constitutional inquiry. The Court ultimately remanded the case to the court of appeals to determine whether the

officer had been accorded a sufficiently prompt *post*-suspension hearing. *Id.* at 935-36. This decision was based in part on the fact that charges by the state police had been dropped but the suspension remained in effect; therefore, "the risk of erroneous deprivation increased substantially." *Id.* at 935.

*Gilbert* is relevant to the present case for at least two reasons. First, it clarifies that the *Mathews* three-part balancing test is the proper standard for analyzing a procedural due process claim of a government employee who has a property interest in his or her job and subsequently suffers an adverse employment action, such as a suspension or a demotion. Second, *Gilbert* illustrates the point that minimum procedural due process requirements ultimately turn on a highly fact-specific inquiry.

When we apply the *Mathews* balancing test to the unusual circumstances of Sonnleitner's demotion, we cannot conclude with confidence that he was afforded adequate pre-deprivation process. In terms of the private interests affected by the demotion decision, we acknowledge that Sonnleitner's case may at first glance appear to be less pressing than the officer in *Gilbert*, who was suspended for several weeks without pay (and thus placed in a more precarious financial situation). However, the only post-disciplinary process available to Sonnleitner was his appeal to the Wisconsin Personnel Commission. Sonnleitner notified the Commission of his intent to appeal on January 25, 1996, and a hearing was eventually convened on September 15-17, 1998. This proceeding, which occurred more than two and one-half years after the demotion, was Sonnleitner's *first* opportunity to directly address *all* of the allegations against him.

Although our inspection of the record strongly suggests that settlement negotiations were substantially

responsible for this prolonged delay,[5] there remains considerable uncertainty over whether this type of administrative appeal could have been addressed quickly enough to satisfy minimum due process requirements. In *Gilbert*, the Court noted that the "length" of the deprivation is relevant in determining what process is due. *Id.* at 932 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)). The Court then went on to rule that the university was not required to convene a predisciplinary hearing before suspending the officer without pay "[s]o long as the suspended employee received a *sufficiently prompt* postsuspension hearing." *Id.* (emphasis added).

The *Mathews* balancing test next requires us to consider the competing interests of the state. Here, we readily acknowledge substantial factors weighing in favor of the WDHFS. Specifically, we note that Kathleen Bellaire, as Director of Nursing, was charged with the smooth functioning of Sonnleitner's unit, including the maintenance of

---

[5] At some point after filing his appeal, Sonnleitner retained a lawyer. Shortly thereafter, Sonnleitner filed another complaint with the Wisconsin Personnel Commission alleging that his demotion was motivated by sex and handicap discrimination. (The nature of the Sonnleitner's alleged handicap is not part of the record.) After some initial and unproductive settlement negotiations, a pre-hearing conference with the Commission was held via telephone on August 1, 1996, and a hearing date was then set for December 10-12, 1996. However, this hearing was postponed in light of seemingly productive settlement talks. After the parties failed to reach a settlement, and status reports were filed with the Commission, a new hearing was set for March 3-5, 1998. But once again, the hearing was postponed to pursue further (unsuccessful) settlement negotiations. Sonnleitner later withdrew the employment discrimination charge. Sonnleitner's hearing before the Wisconsin Personnel Commission, which was his only post-disciplinary process, finally took place on September 15-17, 1998.

a highly structured program of patient therapy and treatment. Although Sonnleitner's three Rule #1 violations may involve seemingly minor misconduct with patients, the substance of the rule prohibits "[d]isobedience, insubordination, inattentiveness, negligence, or refusal to carry out written or verbal assignments, directions, or instructions." Insofar as Bellaire's lengthy investigation, including the predisciplinary meeting with Sonnleitner, led her to the conclusion that Sonnleitner's conduct made him unfit as a supervisor, she was arguably justified in recommending his demotion. Yet, Bellaire was not authorized to make this decision by herself. Rather, this type of disciplinary action ultimately required the approval of the Institute director, Stanley York.

As we turn to the third *Mathews* balancing factor, which is the risk of erroneous deprivation and the possible value of additional procedural safeguards, the WDHFS's case falters. After careful review of the record, we believe Sonnleitner makes a plausible argument when he asserts that York would not have approved of the demotion but for the *additional* allegations contained in the Bellaire report. Bellaire completed this document on January 2, 1996, and immediately forwarded it to York. The following day, York wrote the demotion letter, which specifically states, "This action has been taken due to your failure to meet supervisor and administrative duties *and* violation of DH&SS Work Rules #1 and #7" (emphasis added). Despite the WDHFS's position in subsequent litigation that the reason for Sonnleitner's demotion was the four enumerated charges, on the day that York actually made this decision, he appeared to be relying on something more. Our inspection of the record suggests that the alleged "failure to meet supervisor and administrative duties" is most likely a reference to the three unenumerated charges in the Bellaire report, which alleged that Sonnleitner had (a) caused disruption to the nursing unit by neglecting

his nurse supervisory duties, (b) failed to participate in patient review and treatment conferences, and (c) spent much of his time watching television.

As previously noted, the basis for the three unenumerated charges appears to be comments made by Mary Howard during a December 28, 1995, fact-finding meeting—ten days *after* Sonnleitner's predisciplinary meeting. With only a few exceptions, such as prison discipline cases, "[e]x parte presentation of evidence denies due process." *Swank v. Smart*, 898 F.2d 1247, 1254 (7th Cir. 1990) (citing *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959)). When we compare Bellaire's formal, contemporaneous summary of this meeting with the text of the report she filed only five days later, it appears that Bellaire essentially paraphrased Howard's allegations and inserted them directly into the report.[6] From the record, it appears that York may have relied upon the more serious unenumerated charges when approving Sonnleitner's demotion. If Sonnleitner had first been given an opportunity to defend himself against these more serious allegations, it is at least plausible that York would have found the evidence inconclusive and therefore withheld his approval of the demotion decision. The veracity of the three unenumerated violations, it is important to note, was never tested by ad-

---

[6]  *Compare*, *e.g.*, summary of December 18, 1996, meeting ("Howard describes Sonnleitner's involvement on the unit as minimal. She stated he rarely attends treatment conferences and when he does attend his participation is minimal, or he leaves before the meeting is over. When asked how Sonnleitner spends his time Howard stated he works on the APS sheets a lot is also frequently in the dayroom where she believes he is watching TV."), *with* Bellaire report ("[Sonnleitner] has failed to participate in treatment activities on the unit such as patient review and treatment conferences. Sonnleitner reportedly spent much of his time daily in the day room watching TV.").

versarial proceedings. In the subsequent litigation, the WDHFS effectively disavowed them as the actual basis for the demotion. Further, it also appears that Bellaire's assessment of Sonnleitner's work rule violations (i.e., the four enumerated charges) may have been significantly exaggerated, since the Wisconsin Personnel Commission ultimately determined that Sonnleitner was guilty only of one Rule #1 violation.

The upshot of this lengthy analysis is that, risk of erroneous deprivation of Sonnleitner's supervisory position could have been significantly reduced if the Institute had taken the relatively modest step of providing Sonnleitner with a predisciplinary meeting on the Rule #7 violation and the three unenumerated charges contained in the Bellaire report. Therefore, we believe there remains a genuine issue of material fact (a) whether York relied on the more serious charges contained in the Bellaire report when he approved Sonnleitner's demotion, and (b) whether an administrative appeal before the Wisconsin Personnel Commission, without the delay of lengthy settlement negotiations, could have been addressed quickly enough to satisfy the minimum requirements of due process.

However, before we can consider the remaining issues of qualified immunity and the viability of Sonnleitner's official capacity claims, we must briefly address the WDHFS's misguided contention that Sonnleitner has not suffered a legally cognizable deprivation of a protected property interest. Relying on our decision in *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524 (7th Cir. 2000), the WDHFS has vigorously pressed the argument that Sonnleitner's procedural due process claim must fail because Sonnleitner, by virtue of a pay premium he receives as a staff nurse on the night shift, has suffered no economic loss. In *Bordelon*, we affirmed summary judgment for the Chicago school district because one of

its principals, who had been transferred to a purportedly less desirable administrative position, "failed to offer evidence sufficient to allow a jury to find any direct or indirect economic harm as the result of the Board's conduct." *Id.* at 531.

The WDHFS's reliance on *Bordelon* is misplaced for at least two reasons. First, it is undisputed that Sonnleitner's demotion involved a reduction in his base pay. The fact that Sonnleitner offset this loss by taking a staff position with less desirable hours (hence the pay premium) is completely irrelevant to the underlying analysis. Second, this court has held that "the loss of position that impedes future job opportunities or has other indirect effects on future income can inflict an actionable deprivation of property." *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 803 (7th Cir. 2000) (citing *Swick v. City of Chicago*, 11 F.3d 85, 86 (7th Cir. 1993)). In this case, it is reasonable to assume that Sonnleitner's demotion to a non-supervisory position would adversely affect his upward mobility in the future, and thus his income.

## B.

The next issue presented for review is whether the individual defendants are entitled to qualified immunity. In order to proceed with his individual capacity claims against Bellaire, York, Karkula and Joann O'Connor,[7] Sonnleitner must (1) adequately allege the violation of a constitutional right, and (2) that right must be clearly established at the time of the alleged violation, so that a

---

[7] Stanley York has retired as the director of the Institute, and this position is now held by Joann O'Connor. Sonnleitner claims that O'Connor continues to violate his constitutional rights by her refusal to reinstate him as a supervisor.

reasonable public official would have known that his conduct was unlawful. *See Delgado v. Jones*, 282 F.3d 511, 515-16 (7th Cir. 2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

Under the first prong of this inquiry, we agree with Sonnleitner that the Institute may have violated his procedural due process rights by failing to accord him a pre-disciplinary hearing on the unenumerated (i.e., the more serious) charges contained in the Bellaire report. However, under the second prong of the qualified immunity analysis, Sonnleitner has failed to establish that this right was clearly established at the time of the alleged violation. Although Sonnleitner need not offer up a federal decision which precisely mirrors the facts of this case, at a minimum he must point to a closely analogous case decided prior to the challenged conduct. *See Lawhe v. Simpson*, 16 F.3d 1475, 1483 (7th Cir. 1994). Sonnleitner contends that the Supreme Court's decision in *Loudermill* clearly established his right to more exhaustive pre-disciplinary proceedings. However, as discussed earlier, *Loudermill* involved the *termination* of two public employees without *any* pre-termination proceedings, and is therefore factually distinguishable from this case. Since Sonnleitner bears the burden of establishing the existence of a clearly established constitutional right, *see Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc); *accord Delgado*, 282 F.3d at 516; *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957-58 (7th Cir. 1997), and he has failed to cite any additional authorities, we conclude the individual defendants are entitled to qualified immunity.[8]

---

[8] The district court upheld the qualified immunity of the defendants because it found that the decision not to convene additional predisciplinary hearings was objectively reasonable. However, "we may affirm the judgment of the district court on the basis of any

(continued...)

C.

The last issue presented for review is whether Sonnleitner can maintain a lawsuit against the defendants in their official capacity in order to obtain a federal injunction mandating his reinstatement to a supervisory position. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of any Foreign State." U.S. Const., amend. XI. As the defendants correctly point out, the Eleventh Amendment generally bars federal jurisdiction over lawsuits against state officials acting in their official capacities when the state is the real party at interest. *See MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984)).

However, there are three specific exceptions to Eleventh Amendment state immunity to lawsuits in federal court: (1) "Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so through a valid exercise of its power"; (2) a state "has properly waived its immunity and consented to suit in federal court"; and (3) the plaintiff "seek[s] prospective equitable relief for ongoing violations of federal law . . . under the *Ex Parte Young* doctrine." *Marie O. v. Edgar*, 131 F.3d 610, 614-15 (7th Cir. 1997) (citing *Seminole Tribe*

---

[8] (...continued)
ground supported by the record." *Taylor v. Canteen Corp.*, 69 F.3d 773, 784 (7th Cir. 1995); *Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir. 1995) (same). In this case, we affirm the qualified immunity ruling because Sonnleitner has failed to carry the burden of demonstrating that the defendants' conduct violated a clearly established constitutional right.

*of Fla. v. Florida*, 517 U.S. 44, 55-56 (1996), and *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)).

The defendants have clearly raised the shield of Eleventh Amendment immunity. Unfortunately, Sonnleitner has failed to respond to their arguments. Therefore, with respect to the first two exceptions to state immunity, we have no basis to conclude that either Congress has abrogated Wisconsin's Eleventh Amendment immunity or that the state of Wisconsin has authorized this lawsuit through an act of waiver or consent. Moreover, we flatly refuse to undertake our own examination of Wisconsin and federal law to see if such a basis exists. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("It is not this court's responsibility to research and construct the parties' arguments."); *accord Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

Turning to the third exception to state immunity, Sonnleitner's complaint and reply brief have arguably made allegations that are at least consistent with the doctrine of *Ex Parte Young*.[9] Yet, even if this argument is fully developed, we believe that it ultimately fails. In *Verizon Maryland Inc. v. Public Service Commission of Maryland,* 122 S.Ct. 1753 (2002), the Supreme Court held that the *Ex Parte Young* exception requires a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 1760 (quotations omitted). Sonnleitner's request for reinstatement to a super-

---

[9] For example, Sonnleitner's complaint asserts that the defendants, in their official capacity, are "depriving him of his right to return to a position as supervisor." Similarly, in his reply brief, Sonnleitner contends that injunctive relief should be granted in this case because "O'Connor and Leann are continuing the violation of [Sonnleitner's] right to be a supervisor."

visory position can certainly be characterized as prospective relief, but we do not believe that the underlying procedural due process claim can be reasonably construed as "ongoing."

Sonnleitner contends that he was improperly demoted without a predisciplinary hearing on all of the charges contained in the Bellaire report. Assuming *arguendo* that Sonnleitner's constitutional rights have been violated,[10] the violation was not the demotion as such, but, instead, the fact that the demotion occurred without an adequate opportunity to be heard, either through an additional predisciplinary hearing or a sufficiently prompt post-disciplinary hearing. *Cf. Zinermon v. Burch,* 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."); *Porter*, 93 F.3d at 305 ("The presumption is that an individual is entitled to notice and an opportunity for a hearing prior to the state's *permanent* deprivation of his property interest." (emphasis added)). Had Sonnleitner brought this lawsuit during the pendency of his appeal before the Wisconsin Personnel Commission, the proper remedy, depending upon the timing, would

---

[10] The issue whether Sonnleitner was in fact denied procedural due process is a matter that cannot be resolved in the current summary judgment posture. It remains an issue of material fact whether Stanley York actually relied on the more serious unenumerated charges contained in the Bellaire report. Similarly, it is unclear whether the prolonged delay in convening the post-disciplinary hearing before the Wisconsin Personnel Commission was primarily attributable to attempts by Sonnleitner to obtain a favorable settlement. Although we suspect that the administrative review process available in this case was not "sufficiently prompt" to satisfy the minimum requirements of procedural due process, *Gilbert*, 520 U.S. at 932, that issue ultimately turns on additional facts that are not in the record.

have been either a prompt post-disciplinary hearing or reinstatement pending an opportunity to be heard. However, Sonnleitner was eventually given an opportunity to tell his side of the story, and the Personnel Commission found it to be persuasive. The Commission determined that only one of the charges had merit and that Sonnleitner's demotion violated a state policy of progressive discipline. Although the WDHFS arguably failed to comply with the Commission's decision, Wisconsin law permitted Sonnleitner to enforce this decision through a judicial order. *See* Wis. Stat. § 230.44(4)(c). But for Sonnleitner's failure to timely serve the Secretary of the WDHFS, it appears likely that this process would have restored him to a supervisory position.

The upshot of this analysis is that the allegations against the defendants in their official capacities refer to, at most, a past rather than an ongoing violation of federal law. Because these allegations do not fit within the narrow exception of *Ex Parte Young*, the official capacity claims are barred by the Eleventh Amendment.

III.

In summary, Sonnleitner's Fourteenth Amendment right to procedural due process may have been violated when he was demoted to a staff level nursing position without first being given an opportunity to address the more serious allegations in the Bellaire report. Resolution of this question ultimately hinges on material facts that are not in the record. However, remand for a trial on the merits is unnecessary. The individual defendants are entitled to qualified immunity because Sonnleitner has failed to carry his burden of establishing the existence of a clearly established constitutional right to a pre-demotion hearing as to all of the relevant charges. Sonnleitner's official capacity claims also fail because

he has failed to allege an ongoing violation of federal law. Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

        Teste:

                _____

                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*