**Michael DOUBET, et al., Plaintiffs–Appellants,**

v.

**Michael ECKELBERG, et al., Defendants–Appellees.**

**Nos. 02–3820 to 02–3825.**

United States Court of Appeals, Seventh Circuit.

Argued April 7, 2003.

Decided Nov. 18, 2003.

---

Michael A. Brave, Eau Claire, WI, for Plaintiffs–Appellants.

Thomas A. Gilligan, Jr., Murnane, Conlin, White & Brandt, St. Paul, MN, for Defendants–Appellees.

Before BAUER, ROVNER, and WILLIAMS, Circuit Judges.

### ORDER

In 1998, the Somerset, Wisconsin police department began investigating the alleged sexual assault of a minor by the son of Somerset's village president. The plaintiffs, six current and former part-time police officers with the Somerset Police Department, alleged that various village officials attempted to thwart the investigation, violating the officers' constitutional rights in the process. Specifically, the officers claimed that they were terminated without due process, punished for speaking on matters of public concern, and denied equal protection. The district court dismissed certain claims and granted summary judgment to the defendants on the

others, and the plaintiffs appeal these rulings. Because the plaintiffs have not shown that they were deprived of a protected property interest,[1] spoke as citizens on a matter of public concern, or were treated differently than similarly-situated officers, we affirm.

## I. BACKGROUND

At all times relevant to this action, Michael Eckelberg was the Village President of Somerset and a member of the Village Board of Trustees (the Board). In 1998, the Somerset Police Department (SPD) began investigating allegations that Eckelberg's son had sexually assaulted a minor. SPD Chief Rick Pfaff put Officer Michael Kappers in charge of the investigation. The alleged victim was interviewed, and Kappers received the interview transcripts. Kappers and another officer then interviewed Eckelberg's son with Eckelberg present, which was also transcribed. Kappers told Chief Pfaff that he had completed the investigation. From 1998 to 2000, Chief Pfaff repeatedly asked Kappers about the investigation; each time, Kappers told him that he had given the investigation file to the district attorney (D.A.) as required under Wisconsin law. During that period, Kappers visited the Eckelberg residence while on and off-duty on numerous occasions. Eckelberg intervened on Kappers' behalf whenever Chief Pfaff attempted to either fire or discipline Kappers for unacceptable performance.

In January 2000, Chief Pfaff hired Officer Michael Doubet as a part-time probationary officer. He told Doubet that he had serious doubts that Kappers had forwarded the investigation file to the D.A.,

---

1. According to *Slaney v. The International Amateur Athletic Federation,* 244 F.3d 580, 597 (7th Cir.2001), "an appellate court may affirm the district court's dismissal on any ground supported by the record, even if different from the grounds relied upon by the district court."

and asked Doubet to investigate. Chief Pfaff also told Nancy Vanasse, a Board member, that he planned to reopen the case. In January 2001, Doubet interviewed the alleged victim's mother, and confirmed with the D.A. that the investigation file should have been sent to the D.A.'s office. Officer Daniel Barber determined that the file had never been sent. During this period, Kappers and Eckelberg made numerous efforts to prevent Chief Pfaff from further investigating the case. Eckelberg ultimately complained to the Board about Chief Pfaff and Doubet, causing Becky Linke, a Board member, to form a negative impression of Doubet.

On January 13, 2001, Vanasse told Chief Pfaff that the Board was ordering him to halt the investigation. Chief Pfaff then filed charges against Kappers with the Police Review Board (PRB) on January 14, 2001. A few days later, "concerned citizens of Somerset" filed charges against Chief Pfaff with the PRB. Eckelberg convinced the PRB to first hear the charges against Chief Pfaff. Chief Pfaff was suspended (leaving Kappers as the highest ranking SPD officer), and he resigned on February 6, 2001. The PRB never heard the charges against Kappers. Following Chief Pfaff's resignation, the Board appointed John Harvieux as police chief.

During a closed session on February 4, 2001, the Board voted to terminate Doubet and Officers Harker and Meyers (who are not parties to this lawsuit). Doubet received a letter dated March 2, 2001, stating that he was terminated effective February 4, 2001. He received no prior notice of his termination, and claims that he was fired because the Board deemed him disloyal and untrustworthy.

Part-time, non-probationary officers Darren Karnes, Michael Bahneman, Michael Brave, and Johanne Pfaff (not to be confused with Chief Pfaff) [2] claim that they were also involved in the Eckelberg investigation. In April 2001, they filed complaints with the PRB against Harvieux for illegal termination. According to the officers, their names were deleted from the dispatch roster, Harvieux, Vanasse, and others considered them to be terminated employees, their names were removed from their mailboxes and the contents discarded, and they were not given the new combination for the lock on the SPD's rear entrance. The officers contend that like Doubet, many of them were considered disloyal and untrustworthy by the Board, and various Board members had discussed the possibility of terminating part-time officers as early as January 2001. Somerset filed a motion to dismiss; Bahneman, Brave, and Karnes appeared at a PRB meeting and argued in opposition to the motion. The PRB dismissed the complaint, finding that the officers had never been fired.[3] According to the plaintiffs, the officers (with the exception of Doubet) were quietly rehired.

That same month, Doubet filed charges with the PRB against Kappers regarding an alleged cover-up of the Eckelberg investigation. Kappers filed a motion to dismiss, and Doubet argued in opposition to the motion at a PRB meeting. The PRB granted Kappers' motion, and also ruled

---

2. Before Johanne Pfaff filed PRB charges, her last regularly scheduled shift was July 1, 1999. Brave was hired in 1989, but worked as an unpaid officer since the late 1990s. Bahneman worked 169 paid hours in 2000; his last paid workday before filing PRB charges was August 12, 2000. Karnes's last paid workday before filing charges was October 15, 2000. In the year 2000, his paid hours totaled 54.

3. Officer Barber complains that he was subjected to the same treatment; however, Barber never filed charges against Harvieux with the PRB.

against Doubet when he again filed charges against Kappers in May 2001.

The Board eventually became concerned that its February 4 terminations may have been in violation of the Wisconsin closed session statute, and held a special meeting on May 1, 2001. It re-approved Harker and Meyers' terminations, effective May 1, 2001. The Board held another meeting on May 15, 2001, during which it re-approved Doubet's termination and made it retroactive to February 4, 2001.

Harvieux left the force in May 2001, and Kappers was left in charge. Kappers immediately demoted Karnes from corporal to unarmed reserve officer. Nine months later, Kappers demoted Brave from captain to patrol officer, and told him that only part-time officers with written permission could carry firearms. Neither Karnes nor Brave sought a hearing before the PRB in connection with the demotions.

In February 2002, officers Doubet, Barber, Bahneman, Brave, Johanne Pfaff, and Karnes sued Eckelberg, Harvieux, Kappers, numerous Board members, numerous PRB members, and the Village of Somerset under 42 U.S.C. § 1983 and various state statutes. All individual defendants were sued in both their individual and official capacities, and everyone except Doubet alleged due process violations. All plaintiffs alleged equal protection and First Amendment violations. The district court dismissed the plaintiffs' due process and state law claims, and later granted summary judgment to the defendants on the equal protection and First Amendment claims. The plaintiffs appeal the dismissal of the due process claim and the grant of summary judgment on the other claims. As of January 2003, all plaintiffs except Doubet and Johanne Pfaff (who resigned

in April 2002) were on the roster of Somerset part-time police officers, and were offered shifts either by Harvieux or his successors.

## II. ANALYSIS

### A. Due Process Claims

#### 1. Termination Claim

■ Plaintiffs, except Doubet, assert that they were part-time non-probationary police officers with a protected property interest in their employment, and that defendants Harvieux and the PRB terminated[4] their employment without pre or post-deprivation due process. We review the district court's dismissal of the due process claims de novo, accepting as true all the well-pleaded facts alleged in the complaint, and drawing all reasonable inferences in the plaintiffs' favor. *See Galdikas v. Fagan*, 342 F.3d 684, 688 (7th Cir.2003).

Under *Sonnleitner v. York*, 304 F.3d 704 (7th Cir.2002), we ask whether the plaintiffs were deprived of a protected property interest, and if so, what process was required before the plaintiff could be deprived of that interest. *Id.* at 711. Whether a property interest exists turns on state law. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Here, it is clear that as non-probationary police officers, the plaintiffs had a protected property interest in their jobs under Wisconsin law. *See Larson v. City of Tomah*, 193 Wis.2d 225, 532 N.W.2d 726, 728–29 (Wis.1995); *see also Schultz v. Baumgart*, 738 F.2d 231, 234–35 (7th Cir.1984).

However, the facts alleged in the complaint, even when viewed in the light most favorable to the plaintiffs, do not support

---

**4.** Plaintiffs contend that they were either terminated or suspended. For brevity's sake, we discuss the claim in the context of termination, but the analysis is the same for suspension.

the argument that the plaintiffs were deprived of a protected property interest. The plaintiffs point out that numerous individuals, including Harvieux and members of the Board, referred to the plaintiffs as "former" officers on several occasions, removed plaintiffs' names from the March 5 and May 17, 2001 rosters, discussed the difficulties associated with "hir[ing] them [meaning the plaintiffs] back," and told at least one officer that there were no shifts available, among other things. Although we accept these allegations as true, the fact that the defendants used such language is of little consequence in light of the fact that the alleged terminations were never effected. That is, even if the defendants meant to terminate the plaintiffs, the plaintiffs cannot show that the defendants actually manifested their intent. *Cf. Ludwig v. C & A Wallcoverings, Inc.*, 960 F.2d 40, 43 (7th Cir.1992) (finding that the plaintiff had not been terminated, in part because she was never formally discharged).

For example, the fact that some of the plaintiffs were not called to work shifts while Harvieux was police chief does not establish that they were terminated. The officers admit that Somerset police chiefs had complete discretion when determining which officers to call to work particular shifts, that officers were chosen on an ad hoc basis, and that part-time officers were generally asked to work shifts during the busy season (Memorial Day through Labor Day). Thus, not only was Harvieux not *required* to call the plaintiffs for shifts, but his short tenure from February through mid-May was not even during the busy season when the officers should expect to be called.

Additionally, the plaintiffs contend that their mailboxes were removed, their call numbers were reassigned, their names were not on the SPD roster in certain months, and they did not receive the new combination to the SPD door. Not only have the defendants generally provided rational explanations for these actions, but perceived insults such as the removal of a mailbox have purely dignitary dimensions and are thus insufficient to establish a property deprivation. *See, e.g., Gustafson v. Jones*, 117 F.3d 1015, 1020 (7th Cir.1997) (noting that Wisconsin law "does not mention a property interest in particular job assignments on the police force"); *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993) ("We do not think that 'property' within the sense of the [Fourteenth] [A]mendment should be extended to the purely dignitary or otherwise nonpecuniary dimensions of employment."); *Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir. 1983) ("Disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment."). Because the plaintiffs cannot show that they were actually terminated, they have not satisfied the first prong of the test articulated in *Sonnleitner*. Dismissal of the due process claims was therefore proper.

### 2. Demotion Claims

■ Karnes and Brave contend that after they were "rehired," Kappers demoted them without due process. Specifically, they claim that they were stripped of their titles–Corporal and Captain, respectively–and demoted to unarmed reserve officer and patrol officer without off-duty authority to carry a firearm. Wis. Stat. § 62.13(5)(em) states that no police officer can be "reduced in rank" without just cause. However, the courts have generally interpreted demotions giving rise to due process claims to entail more than a mere change in title, and assessed whether the demotion included pecuniary dimensions. *See, e.g., Sonnleitner*, 304 F.3d at 716 (finding a legally cognizable property de-

privation in part because it was "undisputed that [the plaintiff's] demotion involved a reduction in his base pay"). Brave and Karnes have not argued that their pay was reduced–indeed, they do not even argue that their titles were linked to any perks, such as supervisory responsibilities. Their demotions have at most only dignitary dimensions, and cannot serve as the basis for a cognizable due process claim. We therefore affirm the dismissals of the due process claims against Kappers.

## B. First Amendment

■ All plaintiffs claim that Eckelberg and the Board retaliated against them for speaking out against the alleged sexual assault cover-up, in violation of their First Amendment rights. We review the district court's grant of summary judgment to the defendants de novo, viewing all facts in the light most favorable to the officers. *See Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 972–73 (7th Cir.2000).

In order to establish a viable First Amendment claim, plaintiffs must first show that they spoke as citizens on a matter of public concern. *See Wainscott v. Henry,* 315 F.3d 844, 848 (7th Cir.2003). The plaintiffs have failed to satisfy this requirement. Although a sexual assault cover-up on the part of the village police department and the Board may be a matter of public concern, *see Gonzalez v. City of Chicago,* 239 F.3d 939, 941 (7th Cir. 2001); *Myers v. Hasara,* 226 F.3d 821, 826 (7th Cir.2000); *Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir.1993), the plaintiffs have not pointed to any evidence that Brave, Karnes, Bahneman, and Johanne Pfaff ever spoke on this issue. They simply contend that "Doubet maintained frequent contact with Brave, Karnes, and Bahneman regarding the investigation and requested their assistance with several matters during the investigation," and provide no discussion whatsoever of Johanne Pfaff's First Amendment claim. These allegations are not enough to survive summary judgment. *See Robin v. Espo Engineering Corp.,* 200 F.3d 1081, 1088 (7th Cir.2000).

As for the remaining plaintiffs, both Doubet and Barber were involved in the sexual assault investigation. Specifically, Officer Doubet asked the D.A.'s office about its reporting policies for sexual assaults and re-interviewed the mother of the alleged victim. Barber confirmed with the D.A.'s office that Kappers never sent them the investigation file. In *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002), we found that a police officer who "had considerable discretion about how he communicated the information up the chain of command" had a viable First Amendment claim. Plaintiffs argue that like the *Delgado* plaintiff, Doubet, and presumably Barber, "w[ere] conducting a complex investigation requiring [them] to exercise considerable discretion in how [they] communicated the information up the chain of command and [their] disclosure[s] went far beyond some routine discharge of assigned duties." Appellants' Reply Brief at 23. However, the plaintiffs do not point to any evidence in the record to support this claim. Their bare assertion, without more, is insufficient to raise a genuine issue of material fact as to whether the officers were simply performing non-discretionary job functions under Chief Pfaff's direction (as the evidence suggests) or speaking as citizens on a matter of public concern. Therefore, the district court's grant of summary judgment to the defendants on Doubet and Barber's claim was also proper. *See Gonzalez,* 239 F.3d at 941 ("Speech which is made in all respects as part of the employee's job duties is generally not the protected expression of the public employee.").

## C. Equal Protection

Finally, plaintiffs allege equal protection "class of one" claims against Harvieux, the Board members, and the PRB members. Quoting *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.2001), in *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir.2002) this circuit explained that:

> [i]n order to succeed under such a theory, the [plaintiffs] must show that they were (1) intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment or (2) that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant. Under the second approach, if the government would have taken the action anyway, the animus will not condemn the action. Ill will must be the sole cause of the complained-of action. (Citations and internal quotation marks omitted.)

We review de novo the district court's grant of summary judgment to the defendants on these claims. *Nevel*, 297 F.3d at 678.

### 1. Doubet's Claims

█ Notwithstanding the fact that Doubet was a probationary officer who could be fired without just cause, Doubet takes issue with his termination, alleging that he was fired either irrationally or purely out of spite because of his involvement in the Eckelberg investigation. However, the Board articulated reasons unrelated to the investigation for firing him. The fact that Doubet disagrees with these reasons does not by itself create a genuine issue of material fact warranting reversal of a grant of summary judgment, especially under these circumstances. *See*

*Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir.1999) (internal quotation marks omitted) ("Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer."). Indeed, even if the Board *did* hold Doubet's role in the investigation against him, Doubet cannot show that this ill will was the sole cause of his termination, and thus does not have a viable equal protection claim. *See Nevel*, 297 F.3d at 681.

Doubet further asserts that after he was fired on February 4, 2001, Harvieux and the Board rehired officers Teresa Cook and Timothy Ehlers, who are not parties to this lawsuit. He alleges that there was no rational reason for rehiring them, but not Doubet. The district court found that Doubet failed to present any evidence that he was similarly situated to Cook and Ehlers, and Doubet has not remedied this problem on appeal. The fact section of the plaintiffs' brief states only that Ehlers started working for the SPD in June 1999, was fired in the fall of 2000, and was rehired in March 7, 2001, and that Cook was fired at some point, but was rehired around the same time as Ehlers. The brief later claims that Cook, Ehlers, and Doubet were empowered with identical authority and received the same salary. These perfunctory statements, which fail to include any explanation for why Cook and Ehlers were initially terminated, fall far short of the rigorous analysis we would expect Doubet to provide in support of his "similarly situated" argument, and we are unpersuaded by Doubet's alternative argument that he is similarly situated to other probationary officers Harvieux hired who had not previously been fired. Additionally, even if Doubet somehow crossed the similarly-situated hurdle, he has not ex-

plained why Harvieux and the Board's decision to rehire others, but not Doubet, was either irrational or spiteful. We therefore affirm the district court's grant of summary judgment on this issue.

Next, Doubet complains about the Board's handling of his termination. He points out that he was terminated on February 4, 2001, along with officers Harker and Meyers. However, while Harker and Meyers were re-terminated on May 1, 2001, made effective May 1, Doubet was re-terminated on May 15, 2001, made retroactive to February 4. Doubet opines that the defendants made his termination retroactive to February 4 solely to prevent him from proceeding with PRB charges that he had filed in his official capacity as a Somerset police officer against Kappers on May 14, 2001. While we acknowledge that the termination dates are different, Doubet has pointed to no law that probationary officers must be fired on the same date, nor any evidence that Harker and Meyers received either shifts or pay between February 4 (when they were initially fired) and May 1. Moreover, the record does not support Doubet's assertion that the defendants were acting to protect Kappers. Not only are Doubet's allegations purely speculative, but if Doubet's complaint is that he should have been treated like Harker and Meyers, then his termination should have been effective May 1, 2001, which still would have precluded from him filing charges in his official capacity on May 14. Thus, Doubet has failed to show that he was intentionally harmed by the different termination dates or that the defendants were acting vindictively. Accord-

ingly, we affirm the district court's ruling on this point as well.

■ Finally, Doubet contends that the PRB violated his rights when it refused to hold full hearings on his charges against Kappers. When Doubet filed charges against Kappers in April 2001, the PRB required Doubet (who is not a Wisconsin resident) to present evidence that he was an "aggrieved person," and upon determining that he was not, dismissed his claim. When he again filed charges against Kappers in May, the PRB determined that there was no statutory requirement for the PRB to "reconsider or allow refiling of charges previously filed by a complainant and previously disposed of by the Police Review Board by final decision." Doubet points out that the PRB *did* hold full hearings when "concerned citizens of Somerset" filed charges against Officer James Dixon, and thus concludes that he was denied equal protection of the laws. He also questions the PRB's legal conclusions.

We first note that the PRB members, whose decision not to provide full hearings was adjudicatory in nature, are absolutely immune from suit in their individual capacities. *See Wilson v. Kelkhoff,* 86 F.3d 1438, 1444 (7th Cir.1996); *Trotter v. Klincar,* 748 F.2d 1177, 1182 (7th Cir.1984); *Reed v. Vill. of Shorewood,* 704 F.2d 943, 952 (7th Cir.1983); *United States ex rel. Powell v. Irving,* 684 F.2d 494, 497 (7th Cir.1982). With respect to Doubet's claims against them in their official capacities, the PRB was not required to hold full hearings on Doubet's charges. The relevant statute states that a hearing shall be held if the accused requests one,[5] and the

---

5. The plaintiffs point to Wis. Stat. § 62.13(5)(d), which states that "[f]ollowing the filing of charges in any case, a copy thereof shall be served upon the person charged. The board shall set date for hearing not less than 10 days nor more than 30 days following

service of charges." However, this section must obviously be read in conjunction with § 62.13(5)(c), which states that "[n]o hearing on such suspension shall be held unless requested by the suspended subordinate."

plaintiffs have not pointed us to any case law expanding the circumstances under which a hearing must be held. *See Smith v. Town of Eaton, Ind.,* 910 F.2d 1469, 1471 (7th Cir.1990) ("[T]his court cannot be called upon to supply the legal research and organization to flesh out a party's arguments."). In Doubet's case, he was the accuser rather than the accused, and Kappers (the accused) did not request a hearing. Rather, Kappers' attorney filed a motion to dismiss. Doubet's charges were thus not comparable to the "concerned citizens of Somerset['s]" charges (which resulted in the accused requesting a hearing), and Doubet has not shown that it was either irrational or vindictive for the PRB to treat the charges differently. Additionally, even if we assume that the PRB erred in ruling that Doubet did not meet the criteria of "aggrieved person" and that there was no reason to reconsider its ruling, the equal protection clause does not protect against decisions that are simply erroneous. *See Ciechon v. City of Chicago,* 686 F.2d 511, 522 (7th Cir.1982) (explaining that "error or mistake in the application of the law [does not by itself] give rise to an equal protection claim"). Doubet has not shown that the PRB arrived at its legal conclusions based on irrational or vindictive reasoning, and we therefore affirm the district court's grant of summary judgment for the defendants.

### 2. Other Claims

■ The remaining plaintiffs allege that Harvieux treated them differently than other similarly-situated officers by engaging in activities such as removing their names from the mailboxes, changing their duty numbers, and not providing them with the combination number to the build-

ing. They further complain that Harvieux hired new part-time officers to work shifts rather than assigning work to the plaintiffs.[6] However, the defendants have provided rational explanations for these actions, which the plaintiffs have been unable to refute successfully. For example, the defendants point out that not all part-time officers had mailboxes; rather, Harvieux assigned mailboxes to those officers who worked frequent shifts and thus spent more time at the SPD. Additionally, the defendants submit that Harvieux changed the duty numbers because he had adopted the practice of his former employer, who for "field expediency reasons" did not assign duty numbers to every part-time officer. Moreover, Harvieux explained that to combat problems related to theft of police property and evidence, he was divulging the new combination number to the officers only after they were assigned shifts. As for Harvieux's decision to hire other officers to work certain shifts rather than assign shifts to the plaintiffs, we reiterate that the police chief has complete discretion in choosing which officers work shifts, and the plaintiffs have not shown that during Harvieux's tenure, they lost shifts that they would otherwise have been scheduled for had Pfaff still been chief. In any case, it was not irrational or vindictive for Harvieux to be particularly choosy in light of his understanding that various officers were being investigated by certain government agencies, and (being new to the force) he was unsure which of the plaintiffs were already certified in Wisconsin. In sum, the plaintiffs have not made out equal protection violations, and thus summary judgment was warranted on these claims.

---

**6.** One of the plaintiffs' numerous arguments is that they were fired, but other officers were not. Because we explained earlier that the evidence presented does not show that the plaintiffs were terminated, we need not address this argument.

The plaintiffs' final argument is that the PRB treated their charges against Harvieux differently than it treated the charges of the "concerned citizens of Somerset" against Dixon.[7] Not surprisingly, their complaint meets the same fate as Doubet's. The PRB was not required to hold a hearing unless the accused asked for one, and Harvieux did not. It was required to do no more than hold oral arguments on the motion to dismiss the officers' claims. The PRB could reasonably have believed that the two groups were not similarly situated, on the ground that the "concerned citizens of Somerset" were completely removed from the police department, and thus had no obvious potential self-interest. Furthermore, we would hardly label as irrational or vindictive the PRB's ruling that the plaintiffs were never terminated, as we reached the same conclusion ourselves after reviewing the allegations. We therefore affirm the district court's grant of summary judgment in the PRB's favor.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

7. We note that Barber clearly has no claim, as he failed to file charges with the PRB.