# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-2381

LESHON YOUNG and
GLENDELL MAYS,

*Plaintiffs-Appellants,*

*v.*

JAMES GREEN MANAGEMENT,
INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01 C 159—**G. Patrick Murphy**, *Chief Judge.*

ARGUED JANUARY 16, 2003—DECIDED MAY 5, 2003

Before FLAUM, *Chief Judge*, and COFFEY and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge*. The plaintiffs, Leshon Young and Glendell Mays, brought this action against their former employer, James Green Management, Inc. ("Green"). They alleged that they had been terminated on account of their race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The jury returned verdicts in favor of Green. The plaintiffs then sought a new trial on the ground that they had been prejudiced by several evidentiary rulings. The district court denied the motion.

On appeal, the plaintiffs submit that the district court committed reversible error in making several evidentiary rulings. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

Green is a real estate management firm that manages several different apartment complexes in southern Illinois. One such complex is the Chateau Apartments ("Chateau"). On January 3, 2000, after speaking with Gary Olson, the complex's property manager, Leshon Young, an African-American, began working at Chateau as a maintenance worker. Two weeks after he began work, Mr. Young was promoted to acting maintenance supervisor by Gerald Clark, an upper-level manager. On or about February 1, 2000, Glendell Mays, also an African-American, began working at Chateau as a painter. He also had been interviewed by Olson.

Sometime during the first week of February 2000, Olson called Mr. Young into the office; he proceeded to tell Mr. Young that he had been instructed by Gerald Clark to "get rid of Glen [Mr. Mays] because he was black." Trial Tr. II at 217. Olson also told Mr. Young that he planned to tell Mr. Mays about Clark's statement. In reply, Mr. Young, fearing that such a disclosure would cause Mr. Mays' work performance to suffer, asked Olson not to tell Mr. Mays.[1] Mr. Young, citing earlier experience dealing with racial

---

[1]  Mr. Young had heard that management was not pleased with the amount of work that Mr. Mays was performing. *See* Trial Tr. II at 218.

discrimination, also indicated to Olson that he personally would speak to Mr. Mays. *See id.* at 217. Despite Mr. Young's request, Olson promptly informed Mr. Mays that he had been asked to fire Mr. Mays because he was black.

Mr. Mays asked Mr. Young whether it was true that Green wanted to fire him because he was African-American, and Mr. Young responded, "that's what I heard." *Id.* at 218. Mr. Mays testified that he did not take any action at that time in response to Olson's allegations because he was uncertain whether to believe Olson. *See id.* at 169.

On February 11, 2000, Mr. Young's promotion to acting maintenance supervisor was confirmed, and he was given a retroactive pay increase. That same day, Olson faxed a letter to Green's corporate headquarters stating that he was resigning "effective immediately" because he had been instructed by an unidentified Green supervisor (whom Olson identified at trial as Gerald Clark) "to 'hide out' a minority worker for the next week and [to] 'get rid of him' on the first opportunity" because " 'James Green doesn't like blacks working for him. We already have Lee and that is one too many.' " Plaintiffs' Trial Ex.1. According to Olson's testimony at trial, the African-American individuals referenced in the letter were Mr. Young and Mr. Mays.

Sometime during the evening of February 11, 2000, Olson called Mr. Young. When Mr. Young informed Olson of his pay increase, Olson told Mr. Young that he received the raise because of the resignation letter that Olson had sent to Green earlier that day. Olson faxed a copy of the letter to Mr. Young the next day; Olson also informed Mr. Mays of the letter's content. In response to the allegations made in Olson's resignation letter, Mr. Young allegedly told Mr. Mays that they needed to work extra hard to ensure that they did not lose their jobs: "[L]ook, we need to work

as hard as we can . . . because we don't need to give them any reason to fire us. We don't need—we can't give them any type of excuse [] for them to fire us." Trial Tr. II at 219.

As of March 1, 2000, Chateau had only three maintenance workers, two of whom were African-American (Mr. Young and Mr. Mays) and one of whom was white. There was also a white property manager, Magdaline Oates. On March 6, 2000, the entire crew was terminated, including the plaintiffs. Loren Brown, Green's General Manager, testified that he believed the overall appearance of Chateau had steadily declined over the last few weeks and that the crew members had lost interest in their jobs. Brown noticed that trash was not being picked up and work orders were piling up. Brown also observed that Mr. Mays was not painting the apartments in the correct manner; his work was careless and sloppy. Brown spoke to Gerald Clark and Magdaline Oates about his concerns; and, on one occasion, he actually drove Oates around the complex to point out the deficiencies in the crew's work. At some point, it also came to Brown's attention that Mr. Young was spending too much time sitting behind his desk in the office when he should have been in the field performing work orders. *See* Trial Tr. IV at 11. Brown blamed the entire crew for the "trashy" appearance of the complex; he sensed that the entire crew did not take pride in their work and that a change was needed. *Id.* at 14. He determined that he "needed a new crew." *Id.* at 13. On Brown's direction, Gerald Clark fired the entire Chateau crew, including Mr. Young and Mr. Mays, on March 6, 2000.

The plaintiffs believed that they were terminated because of their race. In their view, Green's explanation for their termination was not credible because they had worked "twice as hard" once they learned from Olson that Green's

management wanted to terminate Mr. Mays because he was African-American. Trial Tr. II at 169.

Following the plaintiffs' termination, Green retained four different individuals as subcontractors to maintain Chateau. These individuals, all white, were fired after two weeks of work because they failed to meet management's expectations.

After Olson terminated his employment with Green, he moved into Chateau to care for a disabled woman, Rebecca Luebbert, with whom he later became romantically involved. Olson testified that, when he was leaving the apartment one day, he encountered Loren Brown, who related that the company had received an EEOC letter and that Olson's resignation letter had created a problem. Olson further testified that he agreed to provide Green with a letter retracting his accusations of discrimination in exchange for a letter of recommendation and the forgiveness of $800 in back rent. Olson, in fact, did provide Green with a letter of retraction. However, Loren Brown testified that he never made such an agreement with Olson and that the meeting concerned only Olson's interest in getting a letter of recommendation.

At trial, Gerald Clark testified that he never instructed Olson to "hide out" or terminate Mr. Mays because of his race. He denied having any conversation with Olson in which he expressed the racist sentiments attributed to him in Olson's resignation letter. According to Clark's testimony, Olson fabricated the entire conversation. Also at trial, Rebecca Luebbert testified that, shortly after Olson's resignation, he approached Mr. Young while he was painting an apartment at Chateau and told him that he should "just take [his] time" completing the work and "let them fire [him]." Trial Tr. III at 174-75. Luebbert further testified that Olson gave his pager number to Mr.

Young and instructed him to contact Olson if Green fired Mr. Young. *See id.* at 175. Finally, Luebbert testified that Olson had told her that, in return for helping plaintiffs win their lawsuit against Green, he would share in their award. *See id.* at 178.

## B. District Court Proceedings

Following the jury verdicts in favor of Green, the plaintiffs moved for a new trial on the ground that certain evidentiary rulings by the district court constituted reversible error. In particular, plaintiffs claimed that the district court erred by: (1) excluding Gary Olson's resignation letter from evidence except for the limited purpose of explaining why a subsequent letter of retraction was written; (2) excluding the EEOC determinations of discrimination from evidence; and (3) allowing Green's counsel to elicit details regarding Gary Olson's prior convictions and bad acts and to read from the deposition testimony of an unrelated civil case involving Rebecca Luebbert during cross-examination. The district court denied plaintiffs' motion. The court determined that Olson's resignation letter was properly excluded as inadmissible hearsay because the relevant statements were written after Olson resigned and, therefore, the statements were not admissions by Green because Olson no longer was Green's employee. The court further determined that the EEOC determinations were properly excluded because they were unreliable and untrustworthy. Finally, the court determined that plaintiffs' counsel "opened the door" to the entire line of questioning relating to Gary Olson's convictions and his involvement with Rebecca Luebbert's unrelated civil case and, therefore, Green's counsel "was properly allowed to explore these issues during his cross-examination." R.40 at 2.

## II

## DISCUSSION

### A. Standard of Review

The evidentiary rulings of the district court are given special deference; we shall not reverse such rulings unless the district court abused its discretion. *See United States v. Lea*, 249 F.3d 632, 641 (7th Cir. 2001). Under this standard, "we will not find error unless the court's decision is based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision or the supposed facts which the court found are clearly erroneous." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 570 (7th Cir. 1997). Furthermore, even where an error is demonstrated to exist, "[a] jury verdict will stand if the trial court's evidentiary ruling was harmless error." *Groom v. Days Inn of America, Inc.*, 62 F.3d 204, 208 (7th Cir. 1995). "A harmful error results only if the error had a 'substantial and injurious effect or influence' on the jury's verdict." *Id.* (quoting *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993)); *see also Williams v. Pharmacia*, 137 F.3d 944, 951 (7th Cir. 1998); *Lemons v. Skidmore*, 985 F.2d 354, 359 (7th Cir. 1993); *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1033 (7th Cir. 1990).

### B. Exclusion of Gary Olson's Letter of Resignation

Plaintiffs first submit that the district court committed reversible error when it limited the admissibility of Gary Olson's February 11, 2000, resignation letter to explaining why a subsequent letter of retraction was written. Plaintiffs contend that the resignation letter should have been admitted as non-hearsay under Federal Rule of Evidence

801(d)(2)(D) as an admission by the agent of a party-opponent.

The disputed resignation letter, which Gary Olson addressed and sent to Green's owner, James Green, provided:

> I hereby tender my resignation from your company effective immediately. My resignation is based on the following events that transpired during my employment.
>
> Approximately 1 ½-2 weeks ago, I was informed by your supervisor to "hide out" a minority worker for the next week and "get rid of him" on the first opportunity. I questioned your supervisor for the reasoning behind this thought process. He informed me "James Green doesn't like blacks working for him. We already have Lee and that is one too many." He continued stating, "Lee would never be maintenance supervisor because of his skin color and that Mr. Green would not approve of a black supervisor at the Chateau Town Home complex." I find this repugnant and a gross violation of State and Federal laws. I refuse to act upon the supervisor's demands and will leave that decision to one of your other managers. I find it very disturbing that all of the minority workers I hired are only granted an $8.00 per hour wage while our only Caucasian worker be paid $8.50 per hour whom has less experience and is being trained by Lee to do the electrical work. The pay inequities and rent concessions and other benefits given to certain property managers and ordinary maintenance workers reinforce my belief that a serious reevaluation of your management staff is in order.
>
> My resignation is due to the illegal acts that have been asked of me to perform. If you have any questions, please contact my attorney, Mr. Bob Perica @ 462-1700.

Plaintiffs' Trial Ex.1. Plaintiffs sought to admit this letter to prove that Green had discriminated against the plaintiffs on account of their race. Because the letter is an out-of-court statement and was "offered in evidence to prove the truth of the matter asserted," it constitutes hearsay and, therefore, is inadmissible unless an exception to the hearsay rule applies. Fed. R. Evid. 801(c).

Rule 801(d)(2)(D) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). There is no doubt that Rule 801(d)(2)(D) embodies a broader exception to the hearsay rule than many pre-Rule decisions had permitted. *See Nekolny v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981) (citing Fed. R. Evid. 801(d)(2)(D) Advisory Committee Notes). The Rule simply requires that the statement be made by an individual who is an agent, that the statement be made during the period of the agency, and that the matter be within the subject matter of the agency. *See id.*[2]

The district court determined that the letter was not admissible under this provision. We cannot say that, in light of the totality of the circumstances, this ruling was

---

[2] Generally, there is no requirement that the agent have specific authority to make a statement on the subject. However, we have recognized that, in the context of employment discrimination cases, "the declarant must be involved in the decisionmaking process affecting the employment action involved." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). That exception does not apply here because Olson had authority to terminate the plaintiffs.

an abuse of discretion. Olson's assertions regarding discrimination were not made during the existence of his employment relationship with Green. Olson's letter of resignation is not admissible under Rule 801(d)(2)(D) because the justification for the rule simply is not present in this situation.

We agree that there is a fundamental deficiency here that does not permit the admission of the statement. Olson was not speaking as an employee on behalf of Green when he resigned from his employment and accused Green of racial discrimination; to the contrary, in a very overt manner, Olson was acting not only independently of Green but also as its adversary.[3] Because Olson's out-of-court statement was made in the context of terminating his employment (and placing himself in an adversarial relationship with Green), the justification for Rule 801(d)(2)(D) does not exist because Olson no longer was "inhibited by [his] relationship with the principal from making erroneous or underhanded comments which could harm the principal." *Hernandez Escalante v. Municipality of Cayey*, 967 F. Supp. 47, 51 (D.P.R. 1997).

We also believe that, even if the district court had abused its discretion by refusing to admit the evidence, any error would have been harmless because "it did not have substantial and injurious effect or influence in determining the jury's verdict." *Williams*, 137 F.3d at 951 (inner quotations omitted). Olson testified fully at trial to all of the

---

[3] *Cf. Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 97 (3d Cir. 1999) (holding that employee's statement was not admissible under Rule 801(d)(2)(D) in absence of evidence that employee was speaking for employer on matter within scope of agency or employment).

matters contained in the letter of resignation, *see* Trial Tr. II
at 47-50,[4] and there is no reason to believe that the jury

---

[4] The following exchange took place between the plaintiffs'
attorney and Olson on direct-examination:

Q: Would you describe for the jury the conversation with
Gerald Clark and tell us where it took place?

A: Sure. If I recall we were in the office and Gerald Clark
came in and noticed that Glen was around the area. And
he asked who that was. And I said, that's the new guy
Glen Mays. And he goes, let me talk to you. He didn't
want to say this in front of the secretary because she was
relatively new too. And so we went outside by his truck
and that's when he stated to me that, listen, Gary, you
know, we have older folks out here in Green Meadows
and we don't like the impression that we're hiring these
people. We want to keep this a clean place. And these
older folks get scared of these black people coming in.
And that kind of struck me odd because there's black
people living there. But, anyway, he said, I want you to
hide'em and get rid of 'em. And that just took me back.
And I told him, I said, I can't do that. I can't get involved
in anything like that. I'm not going to be liable and come
to this point where they're sitting. I'm not going to do
that. So I went inside and thought about that all day
what I was going to do, so.

Q: Let me ask you one more, was there any comment made
about Leshon during that same conversation?

A: About Leshon?

Q: Yeah about one too many?

A: Yeah. Yeah. I believe I said that, that there was just one
too many out here and we don't need another one.

Q: And that one too many he was referring to who?

(continued...)

would have given greater weight to Olson's unsworn out-of-court statement than to his sworn testimony in court.

## C. Exclusion of EEOC Determinations of Discrimination

The plaintiffs next submit that the district court committed reversible error when it excluded from evidence the EEOC determinations of discrimination. In their view, the determinations were admissible under Federal Rule of Evidence 803(8)(C), the public records and reports exception to the hearsay rule. Green takes the view, however, that the district court properly excluded these determinations from evidence because they were "unreliable, untrustworthy and their probative value was substantially outweighed by their prejudicial effect." Appellee's Br. at 13.

As a general proposition, administrative findings regarding claims of discrimination may be admitted under Rule 803(8)(C). *See Chandler v. Roudebush,* 425 U.S. 840, 864 n.39 (1976); *Halloway v. Milwaukee County*, 180 F.3d 820, 827 n.9 (7th Cir. 1999); *Tulloss v. Near N. Montessori Sch., Inc.,*

---

[4] (...continued)

> A: I'm sure—it was my impression he was referring to Leshon.

Trial Tr. II at 47-48.

* * * *

> Q: Then what did you do after that as far as what was said to you? Did you fire Glen?
> A: No. I wouldn't do it. I'm not going to participate in that.
> Q: What did you end up doing instead?
> A: Well, I resigned.

*Id.* at 50.

776 F.2d 150, 153 (7th Cir. 1985). The text of Rule 803(8)(C) provides that such findings are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). However, "the district court retains significant discretion as to whether such material ought to be admitted." *Halloway*, 180 F.3d at 827 n.9; *see also* Fed. R. Evid. 803(8)(C) Advisory Committee Notes (suggesting criteria to consider on the issue of admissibility, but noting that no exhaustive list is possible). In addition, a district court "must always determine whether the prejudicial effect of admitting such unreliable information may outweigh its probative value and thereby render it inadmissible under Fed. R. Evid. 403." *Tulloss*, 776 F.2d at 153.

In this case, the EEOC made determinations that both Mr. Young and Mr. Mays were discriminated against on the basis of their race. *See* Plaintiffs' Trial Ex.3, 20. Green filed a motion in limine to exclude the EEOC determinations, as well as the investigatory files. Prior to trial, the district court ruled that it would not admit the EEOC determinations of discrimination. *See* Trial Tr. II at 5. As to the EEOC files, the district court stated that it would "look at the matters in the file on an individual basis." *Id.* Following the parties' presentation of evidence, but before closing arguments, the district court repeated its ruling that the EEOC determinations would not be admitted; at this point, the court also ruled that the EEOC files would not be admitted. *See* Trial Tr. IV at 74. The court explained:

> [T]he court in the exercise of its discretion did not admit the determination, and I think that the performance of the EEOC here in open court is ample evidence as to the general unreliability of these files in general. It would not assist the jury at all. The jury has heard

> evidence from everyone involved themselves . . . . I did
> not admit the entire EEOC file for the same reason.

*Id.*[5]

The district court's reference to "the performance of the EEOC in open court" was premised on the testimony of Gerleen Smith, an investigator with the EEOC, who testified incorrectly regarding the number of Green employees. *See* Trial Tr. II at 149-57. This error in Smith's testimony was significant because it would have subjected Green to the higher damages cap in 42 U.S.C. § 1981a(b)(3)(B). On cross-examination, Smith could not account for the discrepancy. *See id.* at 157.

Apart from Olson's resignation letter, plaintiffs have pointed to no evidentiary material available to the EEOC that was not otherwise available to the jury during trial. We already have determined that this letter was correctly excluded from evidence and that, in any event, the plaintiffs were not prejudiced by its exclusion because Olson testified fully at trial to all matters contained in the letter. In addition, the district court made explicit findings that the EEOC determinations were unreliable and not trustworthy. Under these circumstances, we cannot say that the district court abused its discretion by refusing to admit the determinations. *See Tulloss*, 776 F.2d at 154 (holding that the district court did not abuse its discretion in

---

[5] The plaintiffs do not challenge the district court's decision to exclude the EEOC files; their argument is based solely on the exclusion of the determinations of discrimination. It was appropriate, however, for the district court to consider the state of the file and other surrounding circumstances such as the testimony of EEOC officials in determining whether to admit the findings of the Commission.

refusing to consider EEOC determination where it was "not contended that the evidentiary material available to the EEOC was not also available to the district court"); *see also Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1984) ("Because substantial evidence was presented to the jury on all matters summarized in the report, there is little probative value in the EEOC's conclusory statements regarding the same evidence.").

### D. Cross-examination of Gary Olson

Finally, the plaintiffs submit that the district court committed reversible error by allowing Green's counsel to cross-examine Gary Olson on collateral matters that were irrelevant and prejudicial. In particular, the plaintiffs contend that the district court erred when it allowed Green's counsel to cross-examine Olson regarding details of prior convictions and bad acts and to read from Olson's deposition testimony in an unrelated civil case involving Rebecca Luebbert. The district court denied plaintiffs' motion for a new trial on these grounds. It stated that "[p]laintiffs' counsel opened the door to the entire line of questioning relating to Gary Olson's convictions and his involvement in Rebecca Luebbert's case," and "[t]hus Defendant's counsel was properly allowed to explore these issues during cross-examination." R.40 at 2.

On cross-examination, Olson admitted that he was convicted of automobile theft in 1993 and that he was convicted of three counts of aggravated battery in 2001. *See* Trial Tr. II at 63-65. The plaintiffs do not contend seriously that it was improper for Green's counsel to bring out the existence of Olson's four prior felony convictions, nor could they do so successfully under Federal Rule of

Evidence 609.[6]

The plaintiffs do contend, however, that the district court erred by permitting Green's counsel to cross-examine Olson regarding certain details of his convictions. As a general rule, we have held that "all that is needed to serve the purpose of challenging the witness's veracity is the elicitation of the crime charged, the date, and the disposition"

---

[6] Rule 609(a) provides in relevant part:

For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted . . .; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

Fed. R. Evid. 609(a).

Moreover, the plaintiffs are not in a position to complain about the admission of these convictions because their counsel had inquired into Olson's criminal background on direct-examination and Olson was less than forthcoming:

Q: Okay. Now let me ask you a question. You were convicted of, is it two felonies or one?

A: I was—

Q: Aggravated battery I know is one.

A: Aggravated battery.

Trial Tr. II at 55. By not disclosing that he had three additional felony convictions, Olson left the jury with the false impression that he had only one conviction for aggravated battery. Under these circumstances, Green's counsel certainly was entitled to cross-examine Olson about the existence of prior convictions.

and that "it is error to elicit any further information for impeachment purposes." *Gora v. Costa*, 971 F.2d 1325, 1330 (7th Cir. 1992). In this case, Green's counsel was permitted to elicit additional information from Olson regarding his convictions; nevertheless, under the circumstances here, we cannot say that the district court abused its discretion in permitting counsel this latitude.

The district court permitted Green's counsel to elicit from Olson that Luebbert was the victim in two of the aggravated batteries. *See* Trial Tr. II at 74. This disclosure was prompted by Olson's testimony on direct-examination regarding the nature of his relationship with Luebbert. Olson testified that, in March of 2000, he had moved into Luebbert's apartment and that he "was helping her out so she would get better." *Id.* at 57. Under these circumstances, it was within the district court's discretion to permit Green's counsel to elicit on cross-examination that the aggravated batteries occurred while he was living with Luebbert and allegedly caring for her needs.

The district court also permitted Green's counsel to elicit minor details regarding Olson's 1993 conviction for stealing an automobile. Specifically, on re-cross, Green's counsel asked Olson whether he had told the judge at the criminal proceeding that he had stolen the vehicle and how old he was at that time. *See* Trial Tr. II at 137-38. These questions were designed to rebut Olson's testimony during re-direct that he did not steal the vehicle and that the incident did not result in a conviction:

> Q: [W]ould you describe to the jury how you were charged with theft back in 1993, even though I don't believe it has anything to do with this case but since it's in here.

> A: Yes, I sure will. I pled guilty to an SIS which is a suspended imposition sentence. I was a tow truck

> driver and I picked up a car that belonged to another person. The person pertaining [sic] to be the owner was not the actual owner. I took the vehicle and parked it. And the owner found out about it and I was charged with—
>
> Q: And is it your understanding, even today that's not a conviction?
>
> A: It is not a conviction in.
>
> Q: In Missouri?
>
> A: It is not a conviction.

*Id.* at 130. Given Olson's testimony on re-direct, the district court acted within its discretion when it permitted Green's counsel to inquire further into Olson's conviction.

The district court also allowed Green's counsel to ask Olson whether his former employer, a law firm, had accused him of stealing documents. *See* Trial Tr. II at 63.[7] Federal Rule of Evidence 608(b), which governs the admissibility of specific instances of conduct for purposes of impeachment, provides in relevant part:

---

[7] As a general proposition, "[c]ross examination as to a specific instance relating to the character for untruthfulness of the particular witness being examined . . . should be phrased in terms of the underlying event itself. Thus where the specific act is probative of untruthfulness of the witness being cross-examined, the question should not inquire about rumors, reports, arrests or indictments but rather about the underlying specific event of misconduct itself." Michael H. Graham, Handbook of Federal Evidence § 608.4 (5th ed. 2001). We note in passing that the plaintiffs make no argument with respect to the form of this question. Nor did the plaintiffs make any such objection in the district court. We therefore need not address this issue.

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the district court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness.

Fed. R. Evid. 608(b).

Stealing is probative of untruthfulness; therefore, the district court acted within the bounds of its discretion in allowing counsel to inquire on cross-examination with respect to this incident.

Moreover, plaintiffs' counsel opened the door to this line of questioning. On direct-examination, plaintiffs' counsel asked whether Olson left his employment with the law firm because he had "some kind of problem" with the firm. Trial Tr. II at 39. When Olson replied "yes," plaintiffs' counsel asked: "And can you briefly tell the jury what you were being accused of?" *Id.* Olson testified that he was accused of taking a client's documents and turning them over to opposing counsel. *See id.* at 39-40. In discussing the situation, Olson attempted to portray his conduct in a charitable light. Green merely followed up on this line of questioning on cross-examination. Even if Green's counsel could not otherwise have inquired about the incident, the district court was within its discretion in permitting the testimony because plaintiffs' counsel initiated the subject. *See United States v. Anifowoshe*, 307 F.3d 643, 649 (7th Cir. 2002) ("This circuit has held on numerous occasions that when a party questions a witness on a subject, even though that subject may not be strictly relevant to the case, the party cannot complain on appeal if the opposing

party subsequently introduces evidence on the same subject.") (internal quotations omitted).

Plaintiffs' final contention is that the district court erred when it permitted Green's counsel to use extrinsic evidence to impeach Olson on a collateral matter. On cross-examination, Green's counsel asked Olson whether he blamed Luebbert for certain problems in his life. *See* Trial Tr. II at 125. When Olson responded that he did not, Green's counsel impeached Olson with testimony from an unrelated civil action filed by Luebbert, in which Olson testified that he was angry with Luebbert, that he blamed her for his problems and that he wanted to make her suffer. *See id.* at 126.

"[A] witness may not be impeached on a collateral matter by use of extrinsic evidence of prior inconsistent statements." *United States v. Roulette*, 75 F.3d 418, 423 (8th Cir. 1996); *see also United States v. Senn*, 129 F.3d 886, 894 (7th Cir. 1997) ("[E]xtrinsic evidence may not be used to prove impeachment on a collateral matter."). "A matter is collateral if it 'could not have been introduced into evidence for any purpose other than contradiction.'" *United States v. Williamson*, 202 F.3d 974, 979 (7th Cir. 2000) (quoting *United States v. Jarrett*, 705 F.2d 198, 207 (7th Cir. 1983)).

Whether Olson blamed Luebbert for certain problems in his life was a collateral matter and, therefore, Green's counsel should not have been permitted to use extrinsic evidence to impeach Olson on this point. Nevertheless, we are convinced that the error was harmless because "it did not have substantial and injurious effect or influence in determining the jury's verdict." *Williams*, 137 F.3d at 951 (internal quotations omitted).

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*