# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-2210

JAMES GALDIKAS, CATHERINE HANSEN,
CAROL D. HEDGSPETH, et al.,

*Plaintiffs-Appellants,*

v.

STUART I. FAGAN, PAULA WOLFF,
HARRY KLEIN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 4268—**Suzanne B. Conlon**, *Judge.*

ARGUED OCTOBER 31, 2002—DECIDED AUGUST 15, 2003

Before RIPPLE, MANION and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The plaintiffs, a group of former graduate students in the Master of Social Work ("MSW") program at Governor's State University ("GSU"), brought this action pursuant to 42 U.S.C. § 1983 against various GSU officers and members of the GSU Board of Trustees (collectively, "the defendants") in their individual capacities. They alleged violations of substantive and procedural due process, as well as conspiracy to prevent the exercise of their First Amendment rights. Finally, they alleged retaliation for the exercise of their First Amendment rights.

The plaintiffs also asserted claims under Illinois law for promissory estoppel and fraud. The district court dismissed the plaintiffs' substantive and procedural due process claims with prejudice and granted summary judgment in favor of the defendants on the plaintiffs' First Amendment conspiracy and retaliation claims. The district court also dismissed the plaintiffs' state law claims, but without prejudice. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

GSU is a public university located in University Park, Illinois. The plaintiffs are former graduate students of the MSW program at GSU. The defendants are various GSU officers and members of the GSU Board of Trustees. The plaintiffs allege that the defendants induced them to matriculate in the MSW program at GSU by knowingly and falsely representing to them that the program was approved for accreditation by the National Council of Social Work Education ("NCSWE").[1] According to the complaint, the MSW program was never approved for accreditation by NCSWE, and the defendants took no steps to ensure that the program would gain accreditation. The defendants hired unqualified faculty members and maintained an inadequate curriculum, knowing that such decisions would prevent the MSW program from gaining accreditation.

---

[1] Graduates of unaccredited social work programs are not eligible to become licensed social workers in Illinois. However, in August 2001, the Illinois Legislature suspended for several years the requirement that applicants for a social work license graduate from an accredited program.

Between 1997, when the program was instituted, and 2000, the MSW program was denied accreditation on at least two occasions. In November of 2000, GSU representatives informed the students enrolled in the MSW program that NCSWE had denied accreditation candidacy and that the students would be graduating from an unaccredited program. Shortly thereafter, GSU suspended MSW classes.

On December 5, 2000, MSW students, including the plaintiffs, met with GSU President Stuart Fagan to discuss the MSW accreditation issue. Shortly thereafter, President Fagan and GSU Vice President Timothy Arr met and agreed to allow MSW students to attend a board meeting scheduled for December 15, 2000, so that the plaintiffs could voice their complaints. Several MSW students attended the December 15 meeting, and they were permitted to protest with picket signs. Later that evening, several MSW students attended a GSU holiday party, which also was attended by the defendants; some students carried signs and others passed out leaflets protesting the defendants' handling of the MSW accreditation issue.

On January 12, 2001, the defendants held an executive board meeting to discuss the MSW program. During this meeting, the defendants' attorney summarized his research on the MSW accreditation issue, including the possibility of litigation and settlement options.

On January 27, 2001, GSU hosted a series of alumni events, which entailed an alumni town meeting, followed by individual networking receptions for each of GSU's academic departments, and an alumni dinner. The purpose of the alumni town meeting was to discuss GSU's strategic planning process with alumni, while the purpose of the alumni networking receptions and dinner was to facilitate alumni networking. Featured speakers at the

dinner included President Fagan and State Senator Debbie Halvorson.

The GSU Alumni Association created the invitation list for the January 27 events by identifying all GSU graduates as of August 2000, and eliminating any whose addresses were not in zip codes within driving distance. Invitations were mailed in December of 2000, and invitees were asked to return a response card by January 15, indicating which of the events they planned to attend. Although GSU officials initially expected around 250 alumni and guests to attend the events, more than 900 confirmed their attendance.

In preparation for the January 27 events, GSU Director of Public Safety Albert Chesser composed two memos addressed to President Fagan regarding security. In the first memo, dated January 18, 2001, Chesser stated that "[c]ampus access will be open and we expect a positive impact in handling the potential protestors and/or disturbances." R.54, Ex.17. In a second memo, dated January 25, 2001, Chesser noted a change in plans. In addition to closing two of the six university entrances and monitoring the remaining four, the memo states that security "will only allow picket signs outside in the vestibule area, but not to stop any flow of guest attendance." R.54, Ex.18. Although both memos were addressed to President Fagan, he denies receiving them, and Chesser recalls sending them to his immediate supervisor, Vice President Arr, rather than to President Fagan.

On the day of the events, the plaintiffs gathered outside of GSU's main entrance in order to protest the defendants' handling of the MSW accreditation issue and to meet with State Senator Halvorson. Some of the plaintiffs carried picket signs. Security officers informed the plaintiffs that they could picket on the walkway outside of the

building, but that they could not bring their picket signs into the building. The plaintiffs were allowed to enter the atrium (without their picket signs) and to converse with registered guests, but they were denied access to other areas of the building, including the library and restrooms. As a result of the restrictions, the plaintiffs claim that they were prevented from attending a previously scheduled meeting with Senator Halvorson.

With the exception of Bruce Friefeld, who arrived after the plaintiffs had disbanded, no member of the Board of Trustees attended the January 27 alumni events. President Fagan, however, was in attendance; at some point during the events, Chesser informed President Fagan of the protest. President Fagan testified that he told Chesser that "the students should be allowed to protest and in no situation whatsoever should there be any physical altercation at all." R.45, Ex.G at 75.

## II

## DISCUSSION

### A. Substantive Due Process

The plaintiffs submit that the district court erred when it granted the defendants' motion to dismiss their substantive due process claim. The plaintiffs submit that the defendants deprived them of a fundamental right to a continuing education. We review a district court's grant of a motion to dismiss de novo. *See Hickey v. O'Bannon*, 287 F.3d 656, 657 (7th Cir. 2002). In doing so, this court must accept all well-pleaded facts alleged in the complaint as true and must draw all reasonable inferences in favor of the plaintiffs. *See Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 782 (7th Cir. 1999). Dismissal is proper if it

appears beyond doubt that the plaintiffs cannot prove any set of facts entitling them to relief. *See First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002).

In *Washington v. Glucksberg*, 521 U.S. 702 (1997), the Supreme Court identified two controlling features of substantive due process:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decision-making that direct and restrain our exposition of the Due Process Clause.

*Id.* at 720-21 (internal quotation marks and citations omitted).[2] In keeping with the analytical pattern mandated by *Glucksberg*, we first must identify carefully the interest that the plaintiffs claim to be constitutionally protected. Then we must determine whether our "Nation's history, legal traditions and practices" permit our characterizing that interest as fundamental. In this process, we must

---

[2] Applying this standard, the Supreme Court held that the asserted right to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause and, therefore, the state's ban on assisted suicide was constitutional because it was rationally related to a legitimate government interest. *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997).

adhere to existing precedent of the Supreme Court and of this court.

As the district court noted, the right asserted by the plaintiffs is best described as the right to an accredited graduate school education. Neither the Supreme Court nor this court has recognized education as a fundamental right. The opportunity to receive a post-secondary education from an accredited graduate school program certainly has not received such recognition. Indeed, in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), the Supreme Court expressly declined the invitation to hold that education is a fundamental right under the Due Process Clause. The Court took the view that education is "not among the rights afforded explicit protection" under the Constitution and that it could not "find any basis for saying it is implicitly so protected." *Id.* at 34. Relying on *Rodriguez*, this court recently stated in *Dunn v. Fairfield Community High School District No. 225*, 158 F.3d 962, 966 (7th Cir. 1998), that, "[a]lthough students may have some substantive due process rights while they are in school, education itself is not a fundamental right." (internal citations omitted).

The Supreme Court has not overruled *Rodriguez*. It is the governing precedent. Nevertheless, the plaintiffs attempt to avoid the clear import of *Rodriguez* by contending that the Supreme Court presumed the existence of a constitutionally protected right in a university student's continued enrollment in a public institution in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), and in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978). The plaintiffs' reliance on these cases is misplaced. The Court in *Ewing* and *Horwitz* merely "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard." *Ewing*, 474

U.S. at 222; *see also Horowitz*, 435 U.S. at 91-92. In neither case did the Court affirmatively recognize a substantive due process right in a student's continued enrollment in a public institution. Indeed, in both *Ewing* and *Horowitz*, the Court expressly stated that it would not reach the issue of whether the plaintiff's assumed property interest gave rise to a substantive right under the Due Process Clause because the plaintiff's claim failed even if the Court were to assume such a right. *See Ewing*, 474 U.S. at 223 (holding that, even if a student's assumed property interest in a six-year program of study culminating in an undergraduate degree and a medical degree "gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action"); *Horowitz*, 435 U.S. at 91-92 (holding that, even if courts can review an academic decision of a public educational institution under substantive due process, the plaintiff's claim would fail because the defendants' conduct was not arbitrary and capricious); *see also Akins v. Bd. of Governors of State Colls. & Univs.*, 840 F.2d 1371, 1375 (7th Cir. 1988) (noting that neither the Supreme Court nor the Seventh Circuit has recognized that a student at a state-supported university has a substantive due process right to continued enrollment), *vacated on other grounds by Bd. of Governors of State Colls. & Univs. v. Akins*, 488 U.S. 920 (1988).

The plaintiffs' submission fares no better when it is characterized as a display of arbitrary government action that deprived the plaintiffs of their asserted interest in obtaining a degree from an accredited post-secondary institution. In their view, the alleged action of the defendants shocks the conscience and therefore constitutes the sort of egregious executive action that the substantive component of the Due Process Clause is designed to prevent.

In *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), the Supreme Court, in elaborating on the particular substantive due process concerns that ought to be addressed by a court in assessing executive action, noted that the cornerstone of due process is protection against government power arbitrarily and oppressively exercised. The Court emphasized that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846 (internal quotation marks omitted). The Court then defined such constitutionally cognizable conduct as that which "shocks the conscience." *Id.*[3] Elaborating

---

[3] As noted by many courts and commentators, the majority opinion in *Lewis* leaves a number of questions unresolved. The principal ambiguity is whether the "shocks the conscience" standard replaces the fundamental rights analysis set forth in *Glucksberg* whenever executive conduct is challenged or whether the "shocks the conscience" standard supplements or informs the *Glucksberg* paradigm in such situations. Certain language in the majority opinion in *Lewis* suggests that the "shocks the conscience" standard should be applied as an antecedent or threshold inquiry in all cases of executive conduct. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847-48 n.8 (1998). Other passages suggest that the "shocks the conscience" inquiry may be employed to inform the historical inquiry into the nature of the asserted liberty interest. *See id.* Justice Kennedy, joined by Justice O'Connor, also suggested that a "shocks the conscience" inquiry is best understood as a beginning point in the court's search for whether the executive action in question can be said to have found historical acceptance, or at least tolerance, among traditional executive practices. *See id.* at 856-58 (Kennedy, J., concurring); *see also Hawkins v. Freeman*, 195 F.3d 732, 738-39 n.1 (4th Cir. 1999) (en banc).

This ambiguity has been noted as well in our own earlier cases. For example, in *Khan v. Gallitano*, 180 F.3d 829, 836 (7th Cir.

(continued...)

---

[3] (...continued)
1999), this court applied the *Glucksberg* fundamental rights analysis to executive conduct, concluding that the specialized "shocks the conscience" analysis applies only in limited circumstances such as high-speed chases or pre-trial detentions. However, the panel then went on to state that it would reach the same conclusion—that the plaintiff's claim fails—whether it asked if the defendants' conduct shocks the conscience or if the defendants violated a fundamental right deeply rooted in history and tradition. *See id.* By contrast, in *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998), this court read *Lewis* to require a three-part analysis: (1) whether the plaintiff's asserted interest is protected by the Due Process Clause; (2) whether the defendant's conduct offends the standards of substantive due process; and (3) whether the totality of the circumstances shocks the conscience. According to the court in *Armstrong*, "executive conduct does not violate substantive due process—it does not shock the conscience—unless it meets all three of the conditions." *Id.* at 571. In *Dunn v. Fairfield Community High School District No. 225*, 158 F.3d 962, 965-66 (7th Cir. 1998), the panel appeared to view *Lewis* and *Glucksberg* as adopting more independent tests for challenges to executive and legislative action.

Our case law on this point seems to reflect a more generally perceived confusion as to the interrelationship of *Lewis* and *Glucksberg*. *See* Matthew D. Umhofer, "Confusing Pursuits: Sacramento v. Lewis and the Future of Substantive Due Process in the Executive Setting," 41 Santa Clara L. Rev. 437 (2001); Robert Chesney, "Old Wine or New? The-Schocks-the-Conscience Standard and the Distinction Between Legislative and Executive Action," 50 Syracuse L. Rev. 981 (2000); "The Supreme Court 1997 Term Leading Cases," 112 Harv. L. Rev. 122, 192-202 (1998).

Resolution of this ambiguity is not necessary to our decision today. For the reasons set forth in the text, the plaintiffs' substantive due process claim fails under any reading of *Lewis*. The

(continued...)

on this standard, the Court stated that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process" and that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.

We do not believe that the alleged executive action in this case can fairly be characterized as "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 848 n.8. The plaintiffs allege that the defendants induced them to enroll in a Master of Social Work program by knowingly and falsely representing to them that the program was approved for accreditation. The plaintiffs further allege that the defendants failed to take the steps necessary to ensure that the program would gain accreditation. According to the plaintiffs, the defendants hired unqualified faculty members and maintained an inadequate curriculum, knowing that such decisions would prevent the MSW program from gaining accreditation. Assuming that these allegations are true, we certainly are sympathetic to the plaintiffs' situation; however, we do not believe that the defendants' alleged conduct is sufficiently egregious to "shock the conscience," as that term has been employed in substantive due process analysis.

---

[3] (...continued)
Supreme Court has not recognized a fundamental right to education. It certainly has not recognized a fundamental right to a post-secondary accredited degree program. Taking the plaintiffs' allegations that the defendants acted improperly by misleading them about the accreditation status of the MSW program as true, such conduct is not sufficiently egregious to shock the conscience.

Finally, we note further that the plaintiffs' due process claim cannot succeed under the precedent of this circuit because adequate state law remedies are available to them. The plaintiffs' asserted substantive due process interest exists (if at all) only as a matter of state contract law. In *Contreras v. City of Chicago*, 119 F.3d 1286, 1295 (7th Cir. 1997), we stated that, when a plaintiff's substantive due process claim is predicated on the deprivation of a state-created property interest, the plaintiff must show (1) that the state actor's conduct was arbitrary and irrational, and (2) that the state actor committed a separate constitutional violation *or* that state law remedies are inadequate. *See also Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 704 (7th Cir. 1998); *Strasburger v. Bd. of Educ., Hardin County Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 357 (7th Cir. 1998); *Doherty v. City of Chicago*, 75 F.3d 318, 325-26 (7th Cir. 1996); *Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir. 1988). We reasoned that such a "disciplined jurisprudence" was necessary in order to not "undermine established Supreme Court precedent requiring plaintiffs complaining of arbitrary deprivations of their property to seek redress through state remedies." *Contreras*, 119 F.3d at 1295 (internal quotation marks omitted).

Assuming, arguendo, that the defendants acted arbitrarily and irrationally, the plaintiffs' substantive due process claim still must fail because there is no independent constitutional violation and state law provides an adequate remedy. The plaintiffs are able to sue the defendants in state court under various state causes of action, including fraud and promissory estoppel. Accordingly, the district court correctly granted the defendants' motion to dismiss this claim.

**B. Procedural Due Process**

The plaintiffs next submit that the district court erred by dismissing their procedural due process claim. We review the district court's dismissal of this claim de novo. *See Hickey*, 287 F.3d at 657.

A procedural due process claim requires two principal inquiries: first, whether the plaintiff was deprived of a protected property or liberty interest, and second, whether the plaintiff was deprived of that interest without sufficient procedural protections. *See Doherty*, 75 F.3d at 322. In this case, the parties dispute whether the plaintiffs have a protected property interest in an accredited graduate degree; whether the defendants, as opposed to NCSWE, deprived the plaintiffs of that interest; and whether the deprivation occurred without due process of law.

For purposes of procedural due process, property is "a legitimate claim of entitlement." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). A claim of entitlement is not created by federal law; instead it is "created and . . . defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Accordingly, property interests "usually arise from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities." *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001); *see also Johnson v. City of Fort Wayne*, 91 F.3d 922, 943 (7th Cir. 1996) (noting that a property interest may arise from an express or implied contract, as well as a state statute or regulation).

The plaintiffs assert that defendants deprived them of a property interest in an expected degree from an ac-

credited state institution. Illinois courts have not identified clearly a property right in post-secondary education.[4] However, Illinois courts have found that the payment of tuition to an educational institution ordinarily gives rise to an implied contract that the school will award a degree upon the student's satisfaction of the degree requirements established by the school. *See Johnson v. Lincoln Christian Coll.*, 501 N.E.2d 1380, 1384 (Ill. App. Ct. 1986) (holding that a student who allegedly completed all the requirements for a diploma but had not been given a diploma stated a cause of action for breach of an implied contract); *Wilson v. Illinois Benedictine Coll.*, 445 N.E.2d 901, 906 (Ill. App. Ct. 1983) (stating that a university and its students have a contractual relationship and the terms of the contract are set forth in the university's catalogs). Because a property interest may be derived from an implied contract in some instances, *see Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972), and the plaintiffs allege that the defendants represented to them that they would graduate with an accredited degree upon completion of the program's requirements, the plaintiffs arguably possessed a property interest in an accredited degree.

Assuming that the plaintiffs had a protected property interest in an accredited degree, the next inquiry is whether

---

[4]  *See Lee v. Bd. of Trs. of W. Illinois Univ.*, No. 98-4038, 2000 WL 14419, at *3 (7th Cir. 2000) ("Without taking a position on whether Illinois law could establish such a property interest, we hold only that these plaintiffs have not met their burden of showing that Illinois law confers a property interest in their continued attendance at WIU."); *Alexander v. Kennedy-King Coll.*, No. 88 C 2117, 1990 WL 179691, at *4 (N.D. Ill. Nov. 2, 1990) ("It is not clear whether, in Illinois, a property interest exists in a degree expected from a public institution of higher education.").

the plaintiffs' complaint sufficiently alleges that the defendants deprived the plaintiffs of that protected interest. The district court held that the defendants did not work such a deprivation because NCSWE was responsible for making the decision not to grant accreditation. On appeal, the defendants urge this court to affirm the district court's finding, stating that NCSWE's "autonomous accreditation decision, and its impact on the social work program and its graduates, cannot support a claim for procedural due process against the GSU defendants." Appellees' Br. at 22. The plaintiffs, on the other hand, argue that the district court and the defendants misconstrue their allegations; although NCSWE was responsible for approving the accreditation process, the defendants were responsible for ensuring that its programs and faculty were sufficient to qualify for accreditation.

We believe that the plaintiffs' complaint states a sufficient deprivation caused by the defendants. Taking the allegations in the complaint as true, as we must, the defendants induced the plaintiffs to enroll in the MSW program by knowingly and falsely representing to the plaintiffs that the program was or would be approved for accreditation and then took no affirmative steps to ensure that the program would qualify for accreditation.

Because the defendants' alleged conduct was "random and unauthorized," we must focus on whether meaningful post-deprivation remedies exist under state law. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."). The answer to this question is yes. The plaintiffs are free to seek a wide variety of relief in state

court under numerous legal theories, including common law fraud and promissory estoppel. There is no reason to believe that these potential causes of action do not afford the plaintiffs a meaningful post-deprivation remedy. Although the plaintiffs' complaint alleges that they "had no available state remedies to address the defendants' refusal to provide them with the expected degrees for which they matriculated," this court routinely has held that "such a conclusory allegation is insufficient" to state a procedural due process claim, especially as in this case, when the plaintiffs have "failed to explain why [they] cannot pursue [their] claim in the Illinois state courts."[5] *Doherty*, 75 F.3d at 324.

## C. First Amendment Claims

The plaintiffs next submit that the defendants conspired to prevent the plaintiffs from exercising their First Amendment right to protest the defendants' handling of the accreditation process during the January 27 alumni events and that the defendants retaliated against the plaintiffs on that date for previously exercising their right to speak out in opposition to GSU and its administration. The plaintiffs contend that the defendants retaliated against them by preventing them from picketing inside the building and by denying them access to various parts of the building, including the library and restrooms. Following discovery, the district court granted summary judgment in favor of the defendants on the ground that the plaintiffs had failed to offer sufficient evidence that the

---

[5] Indeed, we note that the plaintiffs filed a separate lawsuit in Illinois state court following the district court's dismissal of their due process and state law claims.

defendants personally were involved in the decision to restrict the plaintiffs to the atrium without picket signs during the alumni events. We review a district court's grant of summary judgment de novo, construing all facts in favor of the nonmoving party. *See Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 854 (7th Cir. 2002). Summary judgment is proper if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003).

"Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983); *see also Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996). Section 1983 "does not allow actions against individuals merely for their supervisory role of others." *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). Instead, "[a] causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf-Lillie*, 699 F.2d at 869.

In this case, the plaintiffs contend that a genuine issue of material fact exists as to whether President Fagan and the individual members of the Board of Trustees conspired to prevent the plaintiffs from exercising their First Amendment rights during the January 27 alumni events.

The evidence relating to the trustees is particularly weak. With the exception of Bruce Friefeld, none of the trustees attended the alumni events, and Friefeld did not arrive until after the plaintiffs had left and the alleged First Amendment violation had taken place. Essentially, the plaintiffs contend that the trustees' participation in the alleged constitutional deprivation may be inferred from

their discussion of the accreditation issue during the Board of Trustees' executive meeting on January 12, 2001, and the temporal proximity between that meeting and the events that transpired on January 27. We cannot accept this argument.

The minutes for the January 12 meeting reflect that the defendants' attorney was present and that he "summarized the research he had done regarding the MSW program accreditation issue and informed the Trustees of possible litigation options the students might pursue." R.54, Ex.14. The minutes further reflect that "[p]ossible settlement options and the budget implications were discussed" and "[t]he draft of a press release regarding the MSW situation was reviewed." *Id*. The minutes do not reflect that the January 27 alumni events, much less a potential demonstration by the plaintiffs during the events, were discussed. Additionally, each of the trustees submitted to the district court an affidavit attesting that he or she had no involvement in anything that transpired in connection with the alumni events. Based on the evidence submitted by the plaintiffs, a reasonable jury could not infer that the trustees participated in a plan to prevent the plaintiffs' protest. Accordingly, the district court correctly granted summary judgment in favor of the trustees.

We now turn to the plaintiffs' contention that President Fagan conspired to impair their First Amendment rights and to retaliate against them for having exercised previously their First Amendment rights.[6]

---

[6] In essence, the plaintiffs argue that President Fagan conspired with the trustees in advance of the January 27 alumni events to violate the plaintiffs' First Amendment rights, but they also

(continued...)

In addition to his presence at the January 12 executive board meeting, the plaintiffs allege that President Fagan was the one who actually articulated the order to prevent the plaintiffs from protesting during the January 27 alumni events. In support of this contention, the plaintiffs offer three pieces of evidence: (1) plaintiff Christy Polaski's testimony that two unidentified security guards told her on January 27 that the building was closed pursuant to President Fagan's instruction; (2) Timothy Arr's testimony that President Fagan had the authority to make the decision that students would not be permitted to enter the building with picket signs; and (3) two security-related memos drafted by Albert Chesser and addressed to President Fagan, which discuss security measures for the January 27 events and the possibility of a MSW protest. We shall examine each of these submissions.

The plaintiffs cannot rely on Polaski's testimony in opposing the defendants' motion for summary judgment because it is inadmissible hearsay. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Civ. P. 801(c). Polaski's testimony is that two unidentified security guards told her that the building was closed pursuant to President Fagan's instruction. The claimed probative value of Polaski's testimony depends entirely on the truth of the security

---

[6] (...continued)
argue that President Fagan was the one who gave the order during the alumni events to prevent them from protesting.

guards' out-of-court statements, *i.e.*, that President Fagan actually gave the instruction to close the building. Accordingly, Polaski's testimony is hearsay and is inadmissible unless an exception to the hearsay rule applies. *See* Fed. R. Civ. P. 802; *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003). Because the plaintiffs have not identified an applicable exception to the hearsay rule, we have no occasion to consider the issue further.

The plaintiffs attach more significance to Vice President Arr's testimony than his actual words will allow. When asked who possessed the authority to decide whether students could enter the building with picket signs, Arr testified: "President Fagan could make that decision. The chief executive officer on the campus at any given time could make that decision. I could make that decision. Chief Chesser could make that decision." R.54, Ex.16 at 43. Arr did not testify that President Fagan *alone* had the authority to decide that students could not bring picket signs into the building, nor did Arr testify that President Fagan ever made such a decision. Indeed, when asked whether he knew if a decision had been made to prevent students from entering the alumni events with picket signs, Arr testified that he was unaware of any such decision. *See id.* Accordingly, Arr's testimony provides little evidence of President Fagan's involvement in the alleged constitutional deprivation.

The two security-related memos provide, at most, evidence that President Fagan approved the use of a reasonable time, place, and manner restriction.[7] Initially, we note

---

[7] Although we assume, arguendo, that President Fagan received the security-related memos, we express some skepticism over whether a reasonable jury could make such a determina-
(continued...)

that the parties disagree over how we should classify the forum in which the plaintiffs sought to protest. The plaintiffs, of course, argue that GSU qualified as a public forum during the alumni events. The defendants, on the other hand, argue that GSU modified the scope of any public forum it may have designated in the past to create a nonpublic forum during the scheduled events. The defendants point out that the alumni events were controlled events, "featuring invited speakers, invited guests, name tags and formal dinners." Appellees' Br. at 37. We believe that the defendants have provided a far more accurate characterization of the record. Even if we assume the existence of a public forum, however, we believe that the record shows that President Fagan authorized nothing more than a reasonable, content-neutral time, place, and manner restriction.

Even in a public forum the government may impose restrictions on "the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The first security-related memo, dated January 18, 2001, does not indicate the existence of any restrictions on speech. The second memo, dated January 25, 2001, provides only that protestors would not be allowed to

---

[7] (...continued) tion. Both memos were addressed to President Fagan; however, President Fagan testified that he did not recall receiving the memos and Chesser attested that he actually provided them to Vice President Arr rather than to President Fagan.

bring picket signs inside the building. This restriction was content-neutral, served the significant government inter-est of crowd control at a scheduled event with 900 reg-istered guests, and left open ample alternative channels of communication, including picketing on the campus walkway outside of the building and speaking to guests inside the building without picket signs. Therefore, the district court properly granted summary judgment in favor of President Fagan on the First Amendment conspir-acy claim.

The plaintiffs' final contention is that a genuine issue of material fact exists as to whether President Fagan re-taliated against them on January 27, 2001, for previously exercising their First Amendment rights on December 15, 2000.[8]

In rejecting the plaintiffs' First Amendment conspiracy claim, we determined that, at most, the evidence sup-ports the conclusion that President Fagan authorized the use of a reasonable time, place, and manner restriction in conjunction with the January 27 alumni events. However, it is well established that an otherwise lawful action "taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *see also Zimmerman*, 226 F.3d at 573 ("[O]therwise permissible conduct can become impermissible when done for retaliatory reasons."). Therefore, we must determine whether there is sufficient evidence in the record from which a reasonable jury could

---

[8] The plaintiffs also assert a retaliation claim against the trust-ees. However, this claim, like the other First Amendment claim, fails against the trustees because there is no evidence that they played a role in formulating the security arrangements for the January 27 alumni events.

find that President Fagan retaliated against the plaintiffs for previously exercising their First Amendment rights.

"In order to establish a prima facie case of First Amendment retaliation, a plaintiff must demonstrate that (1) his conduct was constitutionally protected; and (2) his conduct was a substantial factor or motivating factor in the defendant's challenged actions." *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir. 2002) (internal quotation marks omitted). As to the second requirement, a plaintiff cannot prevail, "even if a defendant was brimming over with unconstitutional wrath against a § 1983 plaintiff" unless the plaintiff "establishes that the challenged action would not have occurred but for the constitutionally protected conduct." *Id.* (internal quotation marks omitted). If the plaintiff meets this burden, "the burden shifts to the defendant, who must show by a preponderance of the evidence that he would have taken the same actions even in the absence of the protected conduct." *Id.*

There is no question that the plaintiffs have satisfied the first requirement of their prima facie case. On December 15, 2000, the plaintiffs attended a GSU board meeting and Christmas party where they criticized the University's failure to provide an accredited MSW program. However, the plaintiffs have not created a genuine issue of material fact regarding the second requirement. To establish that the plaintiffs' protected speech was a "motivating factor" in President Fagan's challenged actions, the plaintiffs rely primarily on chronology. The plaintiffs assert that they spoke out on December 15, 2000, that defendant trustees and President Fagan met in executive session and discussed the MSW accreditation issue on January 12, 2001, and that the plaintiffs were prevented from protesting with picket signs inside the building on January 27, 2001.

Although retaliation may be inferred from chronology in some instances, *see Brady v. Houston Ind. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 939 (7th Cir. 1996), the facts in this case are not sufficient to support such an inference. The evidence shows that President Fagan invited the plaintiffs' speech on December 15, 2000, and that the plaintiffs' protest was peaceful and non-disruptive. These facts, along with the fear of overcrowding on the night of the alumni events, do not lead to an inference of retaliation. Accordingly, summary judgment was properly granted in favor of President Fagan on this claim as well.

**D.  State Law Claims**

Because there are no federal claims remaining, we properly decline to reach the merits of the plaintiffs' state law claims. The district court correctly dismissed the plaintiffs' claims for promissory estoppel and fraud without prejudice.[9]

---

[9] Finally, we summarily affirm the district court's decision to dismiss, without prejudice, the plaintiffs' First Amendment claims against certain "unnamed, known security guards" for failure to comply with the requirements of Federal Rule of Civil Procedure 4(m) and the court's subsequent denial of the plaintiffs' motion for leave to amend the complaint to add the previously unnamed security guards. *See Troxell v. Fedders of N. America, Inc.*, 160 F.3d 381, 383 (7th Cir. 1998) (holding that district court did not abuse its discretion in declining to extend time for service of process under Rule 4(m)).

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*